62 F.3d 1415
 NOTICE: Fourth Circuit Local Rule 36(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
MARBLE BANK, Plaintiff-Appellant,
v.
COMMONWEALTH LAND TITLE INSURANCE COMPANY, Defendant-Appellee.
 No. 94-2326.
 United States Court of Appeals, Fourth Circuit.
 Argued May 2, 1995.
Decided Aug. 10, 1995.
 
 ARGUED: Charles Edward Nichols, Jr., MANNING, FULTON & SKINNER, Raleigh, NC, for Appellant. Larry Bruce Sitton, SMITH, HELMS, MULLISS & MOORE, L.L.P., Greensboro, NC, for Appellee. ON BRIEF: Charles B. Morris, Jr., MANNING, FULTON & SKINNER, Raleigh, NC, for Appellant. E. Garrett Walker, Terrill Johnson Harris, SMITH, HELMS, MULLISS & MOORE, L.L.P., Greensboro, NC, for Appellee.
 OPINION
 PER CURIAM:
 
 
 1
 Appellant Marble Bank (Marble Bank) appeals the district court's entry of judgment after a bench trial in favor of Appellee Commonwealth Land Title Insurance Company (Commonwealth) in its action against Commonwealth for breach of a two-million-dollar title insurance policy that Commonwealth issued in favor of Marble Bank (the Title Policy). The Title Policy insured the priority of a Deed of Trust executed on March 6, 1989 (March 1989 Deed of Trust) in favor of Marble Bank against contractors' liens. We now reverse, order entry of judgment in favor of Marble Bank, and remand with instructions.
 
 I.
 
 2
 This case arises from the failure of the Pinehurst Plantation Project in Pinehurst, North Carolina--a planned 536-acre golf course community with 600 home sites (the Project). Pinehurst Plantation Limited Partnership (PPLP) was the owner/developer of the Project. Marble Bank of Rutland, Vermont, was the financier, and Commonwealth was the title insurer of the property securing the financing. PPLP consisted of two partners--Rossignol Development Corporation (Rossignol), which owned ninety-nine percent as a limited partner, and its wholly owned subsidiary, Rossignol-Pinehurst, which owned one percent as a general partner.
 
 
 3
 Joseph Arndt (Arndt) of Columbia, South Carolina, was lead counsel for PPLP, and Steve Reinhard (Reinhard) of Raleigh, North Caro lina, was local counsel. Robert Pratt of Rutland was lead counsel for Marble Bank, and John May (May) of Pinehurst was local counsel for Marble Bank. Nathen Snelling was the loan officer for Marble Bank in charge of the loan secured by the March 1989 Deed of Trust. Larry Johnson, a licensed attorney in North Carolina, was the issuing agent for the Title Policy on behalf of Commonwealth.
 
 
 4
 The Project's original development plan contemplated two separate loans to PPLP: (1) a five-million-dollar loan to acquire the property (the Acquisition Loan), and (2) a ten-million-dollar revolving loan for constructing the Project (the Construction Loan). Marble Bank made the Acquisition Loan and agreed to fund one million dollars of the Construction Loan on the condition that another bank fund the remaining nine million dollars. The Construction Loan was revolving; it was not intended to fund the estimated thirty-two million dollars anticipated to complete the project. Instead, the Construction Loan would be available to fund short-term development needs and would be repaid from sales of lots and golf memberships.
 
 
 5
 Marble Bank made the Acquisition Loan as planned, but the Construction Loan was never closed because the parties could not locate a participant for the nine-million-dollar portion of that loan. Nevertheless, PPLP began construction on the Project in September 1988 because it desired the golf course ready for play the next season.
 
 
 6
 As construction progressed, PPLP periodically requested that Marble Bank provide interim financing to pay contractors. Marble Bank eventually made four interim construction loans, in addition to the original Acquisition Loan, with four of the five loans secured by deeds of trust insured by Commonwealth. Only the March 1989 Deed of Trust is at issue in this appeal. The March 1989 Deed of Trust secured a two-million-dollar interim construction loan (the Interim Loan). Contractors' liens posed a special risk to the security provided by this deed of trust because it secured a loan financing construction that had started before the loan was closed, making it possible for contractors to file liens after the March 1989 Deed of Trust was recorded which could have priority, see N.C. Gen.Stat. Secs. 44A-10, 12(b) (Michie 1991). Marble Bank's loan agreement, therefore, required that PPLP provide Marble Bank with a lender's title insurance policy protecting against contractors' liens.
 
 
 7
 Reinhard was responsible for obtaining the lender's title policy in favor of Marble Bank. In addition to his position as PPLP's local counsel, Reinhard also held the position of a Commonwealth approved "certifying attorney." As such, Commonwealth issued title insurance policies based on Reinhard's title certifications.
 
 
 8
 Although Marble Bank and PPLP closed the Interim Loan on March 6, 1989, and PPLP simultaneously executed the securing Deed of Trust, Reinhard did not procure the Title Policy in favor of Marble Bank until July 31, 1989. Arndt and Reinhard delayed obtaining a title policy because they believed the Construction Loan would soon be closed and the Interim Loan paid off, making it unnecessary for PPLP to incur the premium expense for a lender's title policy on the March 1989 Deed of Trust. At the time of the Interim Loan closing, May conducted a limited title search at Reinhard's request and forwarded the results to him.
 
 
 9
 In June 1989, Arndt told Reinhard to apply for a title policy for the March 1989 Deed of Trust. At that time, it was well known that the Project was in financial trouble. Reinhard, however, did not apply for the Title Policy until July 24, 1989. By this time, Reinhard, PPLP, and Marble Bank were aware that work had stopped on the Project and that beginning on June 29, 1989, contractors had started filing liens against the Project, which by law, see N.C. Gen.Stat. Sec. 44A-10 (Michie 1991), could have had priority over the March 1989 Deed of Trust. Various contractors on the Project continued to file liens until September 7, 1989, on which date contractors' liens against the Project totalled close to four million dollars.
 
 
 10
 In applying to Commonwealth for the Title Policy on July 24, 1989, via Commonwealth's local agent Johnson, Reinhard forwarded to Commonwealth his certification of title to the property limited to March 6, 1989, a lien affidavit from PPLP stating that all contractors and suppliers had been paid for labor and materials furnished up to March 6, 1989, copies of the Interim Loan documents, and the limited title search conducted by May in March 1989. In his application for the Title Policy, Reinhard failed to inform Commonwealth of the Project's financial troubles, including the fact that contractors had filed liens on the Project or that work on the project had stopped. Notably, there is no evidence in the record to suggest that at the time Reinhard applied for the Title Policy, Marble Bank was aware that the Title Policy had not yet been issued insuring the March 1989 Deed of Trust which it held. Moreover, the record reveals that Marble Bank inadvertently failed to recognize that it had not yet received the Title Policy.
 
 
 11
 Based on the information provided by Reinhard, on July 31, 1989, Commonwealth issued a two-million-dollar title policy in favor of Marble Bank on the March 1989 Deed of Trust. The effective date of the policy was March 6, 1989. Although the Title Policy specifically insured the priority of Marble Bank's March 1989 Deed of Trust against contractors' liens, Commonwealth, in accepting the risk under the Title Policy, imprudently issued the policy on the strength of the PPLP affidavit stating that all contractors and suppliers had been paid up to March 6, 1989, and without requiring an up-date in the title search to the issuing date of July 31, which title up-date, would have, at a minimum, revealed the contractors' liens filed up to July 31, 1989. Likewise, Commonwealth, in reliance on Reinhard's certification and policy application, issued the Title Policy without obtaining lien waivers from the Project's contractors, apparently satisfied with the PPLP affidavit.
 
 
 12
 The Project having ultimately failed, PPLP entered into a settlement agreement with Marble Bank concerning the various outstanding loans, including the Interim Loan secured by the March 1989 Deed of Trust. Under the settlement agreement, Marble Bank converted the outstanding loans to non-recourse debt in return for PPLP's waiver of any legal claims against Marble Bank arising out of the Project's failure. As part of the settlement, Marble Bank formed a wholly-owned North Carolina subsidiary, Pineplan, which acquired Rossignol's ninety-nine percent partnership interest, as well as Rossignol-Pinehurst's remaining one percent. Subsequently, Marble Bank sought two million dollars under the Title Policy in order to partially clear the title of the approximately four million dollars in contractors' liens. Commonwealth refused coverage on the ground that Marble Bank had failed to disclose that work on the Project had stopped and contractors had not been paid for work done on the Project up to March 6, 1989, thereby giving rise to priority liens.
 
 
 13
 Subsequently, Marble Bank foreclosed on the March 1989 Deed of Trust, and on May 14, 1990, purchased the property as the high bid der at the foreclosure sale for approximately two-and-a-quarter million dollars. In June 1990, Marble Bank paid approximately two-anda-half million dollars to settle the nearly four million dollars in contractors' liens having priority over its March 1989 Deed of Trust. Finally, with the contractors' liens having been satisfied, Marble Bank sold the property some time later in a distress sale for seven-andsevenand-a-half million dollars with the agreement that it would release its liens under the Acquisition and February 1989 Deeds of Trust.
 
 
 14
 On January 7, 1991, Marble Bank filed this action against Commonwealth for the Title Policy limit of two million dollars for payments it made to settle contractors' liens to protect the priority of its March 1989 Deed of Trust.[1] Commonwealth continued to deny coverage on the ground that Marble Bank had failed to inform it of the Project's financial troubles. After extensive discovery, the parties submitted the case for a bench trial on a stipulated record of nonexclusive stipulations in the pre-trial order and designated portions of the pleadings, deposition transcripts, and exhibits.
 
 
 15
 At trial, Commonwealth relied on a "non-party fraud" theory for its defense that no contract had ever been formed due to fraud in the inducement. The district court issued its order and final judgment on September 12, 1994, dismissing Marble Bank's claim under the Title Policy and embracing Commonwealth's "non-party fraud" theory embodied in Restatement (Second) of Contracts Sec. 164(2) (1979):
 
 
 16
 If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by one who is not a party to the transaction upon which the recipient is justified in relying, the contract is voidable by the recipient, unless the other party to the transaction in good faith and without reason to know of the misrepresentation either gives value or relies materially on the transaction. The district court concluded that Marble Bank had not given value in reliance on the Title Policy--the value given had long been spent at the time of the issuance of the Title Policy on July 31, 1989. The district court also concluded that Marble Bank could not claim an absence of knowledge and notice of the misrepresentations by Reinhard where Marble Bank had access to the same information that PPLP had concerning the financial condition of the Project at the time of the issuance of the Title Policy, and either knew or should have known that the issuance of the Title Policy without exception to the pending lien claims was foreseeably based on fraud. The district court concluded further that the misrepresentations were material and that Marble Bank took advantage of Commonwealth by permitting the Title Policy to issue based on the misrepresentations. Accordingly, the district court held that Marble Bank could not enforce any contractual rights under the Title Policy and entered judgment in favor of Commonwealth. Marble Bank appeals.
 
 II.
 
 17
 On appeal, Marble Bank challenges the following factual findings as clearly erroneous: (1) Marble Bank had notice of Reinhard's misrepresentations in the form of omissions to Commonwealth in procuring the Title Policy; (2) Marble Bank had not given value in good faith reliance on the Title Policy; and (3) Marble Bank took advantage of these misrepresentations in allowing the Title Policy to issue. Given what it considers the clearly erroneous nature of these factual findings, Marble Bank asserts that the district court erred as a matter of law in concluding that Commonwealth could avoid liability under the Title Policy due to non-party fraud in the inducement.
 
 
 18
 On appeal from a bench trial, we may only set aside findings of fact if they are clearly erroneous, and we must give due regard to the opportunity of the trial court to judge the credibility of the witnesses. See Fed.R.Civ.P. 52(a). "A finding is'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. Gypsum Co., 333 U.S. 364, 395 (1948). In Jiminez v. Mary Washington College, 1995 WL 346964 (4th Cir. Jun. 9, 1995), we recently outlined four predominant "avenues in which the district court may go awry in arriving at its factual findings: (1) the district court labored under an improper view or misconception of the appropriate legal standard; (2) the district court's factual determinations are not supported by substantial evidence; (3) the district court disregarded substantial evidence that would militate a conclusion contrary to that reached; and (4) the district court's conclusion is contrary to the clear weight of the evidence considered in light of the entire record," id. at * 9 (reversing a bench trial because pivotal findings of fact were clearly erroneous). We review the district court's conclusions of law de novo. See Resolution Trust Corp. v. Maplewood Inv., 31 F.3d 1276, 1281 n. 7 (4th Cir.1994). The parties agree that North Carolina substantive law controls the disposition of this case.[2]
 
 A.
 
 19
 The first factual finding that Marble Bank challenges as clearly erroneous is that Marble Bank had notice of Reinhard's alleged misrepresentations in the form of omissions to Commonwealth in procuring the Title Policy. In this regard, Marble Bank initially posits, and we agree, that the district court confused knowledge or notice of the financial problems of the Project in July with knowledge or notice of the alleged misrepresentations by Reinhard in his title certification and application for the Title Policy. Marble Bank readily conceded that it was aware of the financial problems of the Project in July. Contrary to the district court's factual finding, however, the record supports no other finding but that Marble Bank believed the Title Policy had issued in March.
 
 
 20
 The stipulations and the uncontroverted evidence conclusively establish that Reinhard and Arndt did not inform anyone at Marble Bank that they were delaying application for the Title Policy. Arndt testified in his deposition that prior to July 24, 1989, he did not have any discussions with Marble Bank regarding a delay in the application for the issuance of the Title Policy but only discussed the issue with Reinhard. Likewise, Reinhard testified that he did not discuss the delay with anyone from Marble Bank, and he testified specifically that he did not recall discussing it with May, Marble Bank's local counsel. May testified in his deposition that at the time Reinhard requested the Title Policy, he was unaware that a policy had not already been issued and, based on the previous loan closings between Marble Bank and Commonwealth, assumed that a policy had been issued shortly after the Interim Loan closing in March 1989. May also testified that he had no knowledge of the contents of Reinhard's July 24, 1989 letter to Commonwealth requesting the Title Policy. Comporting with this testimony, the correspondence between Pratt, Marble Bank's lead counsel, and Snelling, its loan officer in charge of the loan secured by the March 1989 Deed of Trust, confirms that Pratt believed the Title Policy had been ordered at the time of the Interim Loan closing and so advised Marble Bank. In a March 7, 1989 letter from Pratt to Snelling, the day after the Interim Loan closing, Pratt wrote: "Title insurance should be available immediately as the recording of the Mortgage Deed was the necessary step." (J.A. 716). Snelling also testified that he was not aware of the existence or the contents of Reinhard's July 24, 1989 letter to Commonwealth requesting the Title Policy. Moreover, the parties stipulated that Reinhard alone requested the Title Policy, and the only information Commonwealth received about the Project was the information accompanying Reinhard's July 24, 1989 letter. The evidence admits a single conclusion--Marble Bank did not have actual or constructive notice of Reinhard's alleged misrepresentations to Commonwealth until after the Title Policy had issued. Because the district court found otherwise, its decision is "contrary to the clear weight of the evidence considered in light of the entire record," and thus, its factual finding was clearly erroneous. See Jiminez, at * 9.
 
 B.
 
 21
 The second factual finding that Marble Bank challenges as clearly erroneous is that Marble Bank had not given value in good faith reliance on the Title Policy. The district court found that because Marble Bank had disbursed the funds of the Interim Loan before the Title Policy actually issued on July 31, 1989, then it had not given value in reliance on the Title Policy. In making this finding, however, the district court disregarded substantial evidence that would militate a conclusion to the contrary. See Jiminez, at * 14 (holding a factual finding clearly erroneous because the district court failed to consider other substantial, contrary evidence). The evidence is undisputed that the Interim Loan Agreement required PPLP, as a condition of the loan, to procure a lender's title policy in favor of Marble Bank. Even though, unknown to Marble Bank, the Title Policy had not been requested or issued at the time of the closing and simultaneous disbursement of funds, the evidence is uncontroverted that Marble Bank relied on PPLP's promise to procure the policy. Unquestionably, without the promise of procuring the Title Policy, Marble Bank would not have disbursed the funds under the Interim Loan; here, the promise of the Title Policy was equivalent to its issuance. Because the district court disregarded substantial evidence that would militate a conclusion contrary to that reached, its finding that Marble Bank did not actually rely on the Title Policy in disbursing funds under the Interim Loan was clearly erroneous. See Jiminez, at * 9.
 
 C.
 
 22
 The last factual finding that Marble Bank challenges as clearly erroneous is that Marble Bank took advantage of these misrepresentations in allowing the Title Policy to issue. Having concluded that Marble Bank did not have notice of Reinhard's misrepresentations in the form of omissions to Commonwealth in procuring the Title Policy, Marble Bank could not have taken advantage of Commonwealth, as the district court found. Thus, the district court's finding on this factual issue was clearly erroneous.
 
 
 23
 Given the clearly erroneous nature of the district court's factual findings with regard to Marble Bank's knowledge of the alleged misrepresentations and its reliance on the Title Policy in disbursing the loan proceeds, we are constrained to conclude that the district court erred as a matter of law in holding that Restatement (Second) of Contracts Sec. 164(2) bars Marble Bank from seeking indemnification under the Title Policy.
 
 III.
 
 24
 Commonwealth argues that in the event we hold that it cannot avoid liability on the non-party fraud theory, we can affirm the district court on the basis that Marble Bank has failed to prove that it suffered a compensable loss under the Title Policy. Commonwealth contends that because the value of the Project was allegedly no more than seven-and-a-half million dollars and the combined amount due under the Acquisition and February Deeds of Trust exceeded that amount,[3] then the March 1989 Deed of Trust was not supported by any equity, and thus Marble Bank could not have suffered any loss or damage resulting from a loss in priority. Conversely, Marble Bank argues that its damages should be measured by the amount of money it expended to settle the contractors' liens, thus restoring its priority, regardless of whether its security under the March 1989 Deed of Trust was valueless. Because this uncontroverted amount is in excess of the policy limit, Marble Bank contends that we should enter a judgment awarding it the policy limit of two million dollars as a matter of law. In the event we agree with Commonwealth on this issue, Marble Bank urges that we remand the case to the district court for a finding on the value of the property.
 
 
 25
 In order to calculate Marble Bank's compensable loss, we begin by examining the operative language of the Title Policy. The Title Policy contained the following Endorsement:[4]
 
 
 26
 [Commonwealth] hereby insures against loss or damage by reason of loss of priority of the lien of the insured mortgage over any lien imposed by law for services, labor or material heretofore or hereafter furnished for that portion of the proceeds of the loan secured by said mortgage now or hereafter disbursed in compliance with a legal obligation to disburse contained in a written agreement which must exist at the date of this endorsement.
 
 
 27
 (J.A. 33) (emphasis added). By the terms of the Title Policy, Commonwealth agreed to compensate Marble Bank for any loss or damage suffered by Marble Bank "by reason of loss of priority," id., of its lien under the March 1989 Deed of Trust. As a result of the con tractors' liens in this case, Marble Bank lost its third priority behind the Acquisition and February Deeds of Trust, and counting all the contractors' liens as one, fell to fourth in priority. Therefore, under the operative language, Marble Bank is entitled to recover to the extent that its security, as provided by the March 1989 Deed of Trust, was impaired by its fall from third to fourth in priority. Our interpretation of the operative language comports with the general rule that "[a] title insurance policy is one of indemnity, so that the insured is entitled to recover only the actual loss which he has sustained by virtue of title defects, incumbrances, and the like." Jean Appleman, Insurance Law and Practice Sec. 5216, at 99 (West 1981) (collecting cases); see also Falmouth Nat'l Bank v. Ticor Title Ins. Co., 920 F.2d 1058, 1062-63 (1st Cir.1990) (recognizing that title insurance is a contract of indemnity, not a guarantee, and thus recovery must be based upon actual loss, not merely the existence of a defect covered by the policy); Diversified Mortgage Inv. v. United States Life Title Ins. Co. of New York, 544 F.2d 571, 574 n. 2 (2d Cir.1976) (explaining that a title insurance policy entitles the insured to indemnity only to the extent that its security is impaired and to the extent of the resulting loss which it sustains).[5] Accordingly, to calculate damages, we must first know the value of the property.[6] This is a determination that remains uncertain from the record. At trial, Marble Bank contended that the property was worth at least ten million dollars at the date of foreclosure. This contention was supported by the testimony of its President, Ed Grover. Commonwealth contends Marble Bank's sale of the property for seven-and-a-half million dollars is the best evidence of its value. The district court found that the property was worth in excess of seven million dollars but did not give a more definite figure. Determining the value of property quintessentially involves fact finding, a task which we do not intend to undertake on appeal, see Zenith Radio v. Hazeltine Research, Inc., 395 U.S. 100, 123 (1969). Therefore, a remand to the district court is necessary to determine the value of the property.
 
 
 28
 On remand, after determining the value of the property, the district court should next determine if this amount exceeded the combined amounts due under the Acquisition and February 1989 Deeds of Trust. If it does not, then the inquiry ends, because Marble Bank has failed to prove that it suffered "loss or damage by reason of loss of priority of the lien." However, if the value of the property exceeds the combined amounts due under the Acquisition and February 1989 Deeds of Trust, then Marble Bank is entitled to that amount, or two million dollars, whichever is less. Additionally, in the event the value of the property exceeds the combined amounts, then the district court should determine consequential damages, if any. See Pipkin v. Thomas & Hill, Inc., 236 S.E.2d 725, 731 (N.C.Ct.App.1977) (explaining that the injured party in a breach of contract action "may recover all of the damages which were foreseeable at the time of the contract as a probable result of the breach either because they were a natural result or because they were a contemplated result of the breach"); see also E. Allan Farnsworth, Contracts Sec. 12.14, at 876-77 (7th ed.1982).
 
 IV.
 
 29
 In sum, on the issue of liability, we reverse the district court's entry of judgment in favor of Commonwealth and order entry of judgment in favor of Marble Bank. With respect to remedy, we remand this case to the district court with instructions to calculate Marble Bank's damages, if any, in accordance with this opinion.
 
 REVERSED AND REMANDED
 
 
 [1]
 Marble Bank's suit also sought recovery under another title policy issued by Commonwealth which related to the Project and which insured a two-million-dollar deed of trust executed in February 1989 (February 1989 Deed of Trust) held by Marble Bank. The district court entered judgment for Commonwealth on this claim, and Marble Bank has not appealed that judgment. Thus, we devote no discussion to this claim
 
 
 [2]
 North Carolina has never adopted Restatement (Second) of Contracts Sec. 164(2), and we do not now attempt to decide if it would. Such a decision is unnecessary given our conclusion that the factual findings underpinning the district court's application of this section are clearly erroneous
 
 
 [3]
 The combined amount due under the Acquisition and February Deeds of Trust was nearly eight million dollars including principal and interest
 
 
 [4]
 This language is contained in a specific endorsement to the Title Policy which was "[a]ttached to and made part of said policy." (J.A. 33)
 
 
 [5]
 We find Marble Bank's interpretation illogical. Marble Bank's interpretation measures its loss under the operative language by its loss in priority, a loss it argues it has sustained regardless of whether its security as provided by the March 1989 Deed of Trust was valueless. The difficulty with this interpretation is that it reads out the causation element. Here, the operative language provides that Commonwealth insures "against loss or damage by reason of loss of priority of the lien of the insured mortgage over any lien ...," (J.A. 33) (emphasis added). Furthermore, the case on which Marble Bank relies in support of its interpretation, Bluff Ventures Ltd. v. Chicago Title Ins., 950 F.2d 139 (4th Cir.1991), is inapt because it is factually distinguishable: the value of the collateral in Bluff Ventures unquestionably exceeded the amount of the prior deeds of trust, id. at 141, as opposed to the instant appeal. Thus, the court in Bluff Ventures, unlike this court, was not faced with the issue of whether an insured under a title insurance policy can recover the amount it expended to settle liens, when its underlying collateral is potentially valueless
 
 
 [6]
 We assume without deciding that the value of the property should be determined as of the date of the foreclosure sale