# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-30888

United States Court of Appeals
Fifth Circuit

**FILED**

July 16, 2014

Lyle W. Cayce
Clerk

FIRST AMERICAN BANK,

Plaintiff–Appellant,

v.

FIRST AMERICAN TRANSPORTATION TITLE INSURANCE COMPANY,

Defendant–Appellee.

Appeal from the United States District Court
for the Eastern District of Louisiana

Before BARKSDALE, CLEMENT, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

On remand from this court, the district court conducted a bench trial to determine the extent of First American Transportation Title Insurance Company's (FATTIC) liability to First American Bank (First American) under certain vessel title insurance policies. First American appeals the district court's final judgment, asserting that the court erred in calculating the amount due under the policies by using the wrong date of valuation, miscalculating the value of one of the insured vessels, and improperly making certain deductions. First American also challenges the district court's conclusion that FATTIC did not act in bad faith under Louisiana law. We affirm.

No. 13-30888

# I

This case is before our court for the second time.[1]  Titan Cruise Lines, Inc. (Titan) defaulted on loans obtained from First American.  As we previously recounted, First American loaned Titan $28,000,000 to finance its operation of a gaming vessel known as the Ocean Jewel.  The loan was secured by a ship mortgage on the Ocean Jewel as well as mortgages on the Emerald Express (Emerald) and the Sapphire Express (Sapphire), two high speed catamarans that transported customers to and from the Ocean Jewel.

FATTIC issued two title insurance policies to First American, one for the Ocean Jewel and one for the Emerald and Sapphire (collectively, the Shuttles).  Both policies provide that FATTIC is liable for "actual loss or damage . . . sustained or incurred by [the Insured] by reason of" nineteen enumerated risks.  Relevant to the issues before us, those risks include:

> Lack of priority of the Mortgage insured hereunder over any statutory lien for Necessaries (as that term is defined in 46 U.S.C. § 31301 or its equivalent under the law of [the vessels' country of registration]) provided to the Vessel[s] prior to or after the Date of Policy whether or not the statutory lien for Necessaries arises prior to or after the Date of Policy.

Section 7(a) of the policies provides the extent of FATTIC's liability.  It states, in relevant part, that the company's liability shall not exceed:

> (iii) The difference between the value of the Title as insured and the value of the Title subject to the defect, lien or encumbrance insured against by this policy . . . .

Titan's operations were unsuccessful and the company filed for bankruptcy in August 2005.  At that time, the Ocean Jewel and Shuttles were encumbered by necessaries liens resulting from debts owed to suppliers of necessaries for the vessels.  Shortly after Titan's filing, First American hired

---

[1] *See First Am. Bank v. First Am. Transp. Title Ins. Co.*, 585 F.3d 833 (5th Cir. 2009).

No. 13-30888

Norman Dufour, a qualified marine surveyor and appraiser, to appraise the three vessels. Dufour concluded that, as of August 2005, the Ocean Jewel had a fair market value of $10,800,000; the Sapphire had a value of $2,000,000; and the hull of the Emerald, which was under repair, was worth $200,000.

The bankruptcy court approved an agreement for Tampa Bay Shipbuilding & Repair Company (TBSR) to provide berthing and related services to Titan's vessels. As security for payment, the court granted TBSR perfected first-priority liens on each of the berthed vessels. The court also approved a motion by Titan's estate to sell the Ocean Jewel and the Sapphire. Before the sale could be completed, however, the Sapphire sank at her moorings. The estate negotiated with the purchaser to reduce the purchase price by $500,000 and to exclude the Sapphire from the sale. The bankruptcy court approved this agreement, and the Ocean Jewel was sold for $6,450,000. With First American's consent, the bankruptcy court ordered $1,110,000 of the sale proceeds carved out for the benefit of the estate. Of the remaining balance that was left after certain further payments, $1,162,815 was distributed to holders of necessaries liens, leaving $4,172,215 to First American.

The bankruptcy court subsequently approved the estate's abandonment of the Sapphire. TBSR then filed an *in rem* action against the vessel in federal court, asserting that it had a maritime lien as a result of providing necessaries. Following the court's entry of a default judgment against the Sapphire, the U.S. Marshal seized the vessel and sold it at a public auction to TBSR for a $99,227 credit-bid. Eastern Shipbuilding Group, Inc. (Eastern), meanwhile, purchased the Emerald's hull following that vessel's abandonment for a $10,000 credit-bid.

First American filed suit against FATTIC under the Shuttles policy after the insurer claimed that its liability under that policy was limited to the amounts paid to TBSR and Eastern in the foreclosure sales. Following several

months of litigation, the district court granted FATTIC's motion for partial summary judgment. The court held that First American was not entitled to recover consequential damages and that FATTIC's liability was limited to the amount by which the payments to necessaries lienholders reduced First American's recovery, thus confining the covered loss to the amount bid at the foreclosure sales.

On interlocutory appeal, we affirmed in part and reversed in part.[2] We agreed that First American was not entitled to consequential damages and that its recovery was limited to the "difference between the value of First American's ship mortgages when unencumbered and the value of First American's ship mortgages subject to the necessaries liens."[3] Nonetheless, we held that this difference could not be ascertained solely by reference to the proceeds from the foreclosure sale. Rather, Louisiana law required that "the finder-of-fact . . . take into consideration all other relevant information when valuing loss under a title insurance policy," including "any appraisals, the foreclosure proceeds, and other market data."[4] Accordingly, we remanded to the district court to determine the difference in value as well as "the proper date of valuation."[5]

While the first appeal was pending, First American filed suit under the Ocean Jewel policy. After negotiating or settling necessaries claims on First American's behalf, FATTIC had tendered $1,162,287 to the Bank, the approximate amount paid to the necessaries lienholders out of the revenue from the Ocean Jewel. FATTIC asserted that sum constituted the full amount

---

[2] *Id*. at 839.

[3] *Id.* at 837-39.

[4] *Id.* at 838.

[5] *Id.*

No. 13-30888

due under the Ocean Jewel policy.  First American disagreed, claiming that its covered losses exceeded the amount received by the necessaries lienholders.

On remand from this court, the district court consolidated the cases and permitted discovery.  During discovery, the parties learned that Eastern had sold the Emerald's hull for $500,000 on the open market.  After making deductions for the expenses Eastern incurred in preparing the hull for sale, FATTIC remitted $450,139.50 to First American under the Shuttles policy.  The parties also discovered that the Sapphire had been sold for $500,000.  FATTIC, however, only paid First American $10,515.38, claiming that amount represented the difference between the bank's mortgage as unencumbered and as subject to covered necessaries liens.

After a bench trial, the district court issued findings of fact and conclusions of law.  The court first concluded that the policies unambiguously required the vessels to be valued as of the date of their judicial sales.  Based on those dates, the court found that the Ocean Jewel was worth the amount for which it had sold at the foreclosure sale; accordingly, First American incurred an insured loss of $1,162,287 under the Ocean Jewel policy.  The court concluded, however, that the Emerald's foreclosure sale price was not a strong indicator of that vessel's value.  Instead, it found that First American had incurred an insured loss of $445,137.50, the amount of Eastern's net proceeds from the resale of the vessel's hull on the open market.  The court likewise determined that the $500,000 resale price was the best evidence of the Sapphire's value.  However, it held that First American was not entitled to recover that amount; rather, the bank's insured loss was limited to $411,288 because $88,712 of TBSR's credit-bid consisted of uninsured "superpriority claims."

Prior to making its calculations, the district court concluded that this court's holding from the first appeal regarding the appropriate method of

No. 13-30888

calculation under the Shuttles policy also applied to the Ocean Jewel. Accordingly, in calculating the value of the three vessels, the district court "note[d] for the record that it considered all available relevant evidence." However, it stated that it did not consider First American's appraisals relevant because they were conducted well in advance of the vessels' sales.

Lastly, the court concluded that FATTIC did not act in bad faith. This appeal followed.

## II

Following a bench trial, "a district court's findings of fact are reviewed for clear error and its conclusions of law *de novo*."[6] The court's interpretation of a contract, including whether the contract is ambiguous, "is a matter of law reviewable *de novo*."[7] The parties agree that Louisiana law governs the policies in this case.

## III

First American challenges the district court's calculation of FATTIC's liability on several grounds. First, it argues that the court erred in determining the appropriate date of valuation. It contends that the policy is ambiguous on this question and therefore should be construed against FATTIC or, in the alternative, that the policy unambiguously requires valuation as of the date the title defects were discovered.

Louisiana law provides that "[a]mbiguous policy provisions are generally construed against the insurer and in favor of coverage."[8] Such ambiguity only exists if the "policy provision is susceptible to two or more *reasonable*

---

[6] *McLane Foodservice, Inc. v. Table Rock Rests., L.L.C.*, 736 F.3d 375, 377 (5th Cir. 2013).

[7] *Am. Totalisator Co. v. Fair Grounds Corp.*, 3 F.3d 810, 813 (5th Cir. 1993).

[8] *Cadwallader v. Allstate Ins. Co.*, 2002-1637, p. 4 (La. 6/27/03); 848 So. 2d 577, 580; *see also* LA. CIV. CODE ANN. art. 2056 (2008).

interpretations."[9]  By contrast, "[i]f the policy wording at issue is clear and unambiguously expresses the parties' intent, the insurance contract must be enforced as written."[10]  A contract's silence on an issue does not establish ambiguity if there is only one reasonable interpretation of the parties' intent.[11]

The policies at issue do not specify a date of valuation.  The district court concluded, however, that the policies unambiguously require valuation of the vessels as of the date of the foreclosure sales.  We agree.

Although Louisiana courts have not addressed this issue, a majority of courts from other jurisdictions have held that, in the absence of specific policy language, a title insurer's liability to a mortgagee should be measured using the foreclosure date.[12]  These courts have reasoned that this date is appropriate because the foreclosure is when the insured actually incurs a covered loss.[13]  While a handful of courts have opted to use other dates in

---

[9] *Cadwallader*, 848 So. 2d at 580 (emphasis in original).

[10] *Id.*

[11] *See, e.g.*, *Sims v. Mulhearn Funeral Home, Inc.*, 2007-0054, pp. 14-15 (La. 5/22/07); 956 So. 2d 583, 593.

[12] *See* JOYCE D. PALOMAR, 1 TITLE INS. LAW § 10:16 (2013-14 ed.); Christopher B. Frantze, Equity Income Partners LP v. Chicago Title Insurance Co. *and Recovery Under a Lender's Title Insurance Policy in a Falling Real Estate Market*, 48 REAL PROP. TR. & EST. L.J. 391, 396 (2013); *see also Associated Bank, N.A. v. Stewart Title Guar. Co.*, 881 F. Supp. 2d 1058, 1066 (D. Minn. 2012); *First Internet Bank of Ind. v. Lawyers Title Ins. Co.*, No. 1:07-CV-0869, 2009 WL 2092782, at \*6 (S.D. Ind. July 13, 2009); *RTC Mortg. Trust 1994 N-1 v. Fidelity Nat. Title Ins. Co.*, 58 F. Supp. 2d 503, 535 (D.N.J. 1999); *Marble Bank v. Commonwealth Land Title Ins. Co.*, 914 F. Supp. 1252, 1254 (E.D.N.C. 1996).

[13] *See, e.g.*, *First Internet*, 2009 WL 2092782, at \*6 ("First Internet bargained to have perfect title in the event of a default and foreclosure, so the time of default and foreclosure is when damages should be measured."); *Marble Bank*, 914 F. Supp. at 1254 ("In the court's view, plaintiff did not suffer a loss until it foreclosed on the project.  Since a lender suffers loss only if the note is not repaid, the discovery of an insured-against lien does not trigger recognition of that loss.  Only the completion of foreclosure signifies that a lender will not collect on its note." (citation omitted)); PALOMAR, *supra* note 12, § 10:16; Frantze*, supra* note 12, at 394-95 (citing *RTC Mortg. Trust*, 58 F. Supp. 2d at 535).

calculating the amount due a mortgagee, none has used the date of discovery.[14] Rather, they have generally used the date the loan was made and have involved fact patterns in which there was a total failure of title.[15] The use of the loan date has been justified in such instances on the ground that the insured would not have made the loan if it had known the mortgage would be unenforceable or valueless.[16] That rationale is not applicable to a case like this in which the insured mortgagee could reasonably anticipate that its mortgage would be encumbered by some necessaries liens. Although date-of-discovery is the majority rule for owners' policies, its use is generally justified on the ground that the owner of property suffers a loss immediately upon discovery of a defect, a rationale that is also not applicable to mortgagees.[17]

As First American notes, however, some courts have held that language practically identical to that at issue in this case is ambiguous.[18] We find these cases unpersuasive and, making an *Erie* guess, conclude that the Louisiana Supreme Court would adopt the majority view.[19] "A title insurance policy

---

[14] *See* STEVEN PLITT ET AL., 12 COUCH ON INS. § 185:77 (3d ed. 2014); *see also Citicorp Sav. of Ill. v. Stewart Title Guar. Co.*, 840 F.2d 526, 530 (7th Cir. 1988); *Equity Income Partners LP v. Chi. Title Ins. Co.*, No. CV-11-1614-PHX-GMS, 2012 WL 3871505, at *4 (D. Ariz. Sept. 6, 2012); *G & B Invs., Inc. v. Henderson (In re Evans)*, 460 B.R. 848, 895-900 (Bankr. S.D. Miss. 2011).

[15] *See, e.g.*, *Citicorp Sav.*, 840 F.2d at 527-28; *Equity Income*, 2012 WL 3871505, at *1; *Evans*, 460 B.R. at 895-900.

[16] *See, e.g.*, *Citicorp Sav.*, 840 F.2d at 530 ("As a practical matter, Citicorp would not have extended $27,000 credit to Robinson on the basis of a voidable mortgage. No lender would do so."); *Equity Income*, 2012 WL 3871505, at *3.

[17] PALOMAR, *supra* note 12, at § 10:16; Frantze, *supra* note 12, at 396; *see also Allison v. Ticor Title Ins. Co.*, 907 F.2d 645, 652 (7th Cir. 1990); *Hartman v. Shambaugh*, 630 P.2d 758, 762 (N.M. 1981); *Overholtzer v. N. Cntys. Title Ins. Co.*, 253 P.2d 116, 125 (Cal. 1953).

[18] *See, e.g.*, *First Internet Bank*, 2009 WL 2092782, at *5; *G&B Invs.*, 460 B.R. at 896.

[19] *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000) ("If the Louisiana Supreme Court has not ruled on this issue, then this Court must make an 'Erie guess' and 'determine as best it can' what the Louisiana Supreme Court would decide." (quoting *Krieser v. Hobbs*, 166 F.3d 736, 738 (5th Cir. 1999))).

provides for indemnity 'only to the extent that [the insured's] security is impaired and to the extent of the resulting loss that it sustains.'"[20]  It does not "guarantee either that the mortgaged premises are worth the amount of the mortgage or that the mortgage debt will be paid."[21]  As we recently held, a mortgagee does not suffer a loss under a title insurance policy governed by Louisiana law until its title actually fails.[22]  This is so even when an impairment prevents the insured from taking actions that could ultimately mitigate its losses.[23]  It would therefore be an unreasonable interpretation of the policies to say that they provide for valuation as of the date of the discovery since no loss occurs at that point.  The most appropriate date to use in calculating First American's losses is the date of the foreclosure sales, as that is when First American incurred covered losses.  Accordingly, the district court did not err in selecting that date as the appropriate date of valuation.

## IV

First American next argues that the district court erred in calculating the value of the Ocean Jewel, even as of the date of foreclosure, because the court failed to consider all available evidence of the vessel's worth.  As First American concedes, the district court specifically stated for the record that it considered "all relevant evidence" of the Ocean Jewel's fair market value in calculating damages.  Nonetheless, First American asks us to examine what

---

[20] *Gibraltar Sav. v. Commonwealth Land Title Ins. Co.*, 905 F.2d 1203, 1205 (8th Cir. 1990) (alteration in original) (quoting *Diversified Mortg. Inv. v. U.S. Life Title Ins. Co. of N.Y.*, 544 F.2d 571, 574 n.2 (2d Cir. 1976)).

[21] *Blackhawk Prod. Credit Ass'n v. Chi. Title Ins. Co.*, 423 N.W.2d 521, 525 (Wis. 1988).

[22] *Amzak Capital Mgmt. v. Stewart Title of La. (In re West Feliciana Acquisition, L.L.C.)*, 744 F.3d 352, 358 (5th Cir. 2014).

[23] *See id.*; *see also First Am. Bank v. First Am. Transp. Title Ins. Co.*, 585 F.3d 833, 838-39 (5th Cir. 2009) (holding that First American may not recover consequential damages, including losses "arising from the results of damage rather than from the damage itself" (quoting BLACK'S LAW DICTIONARY 964 (8th ed. 2004))).

the court did, rather than what it said. First American contends that, notwithstanding the district court's statements, it did not actually measure the Ocean Jewel's fair market value based on all available evidence since the district court disregarded the testimony of First American's expert appraisers and relied exclusively on the price the vessel commanded at the foreclosure sale.

As mentioned, we held during the first appeal that Louisiana law required the district court to calculate the value of the Shuttles based on "all . . . relevant information," including "any appraisals, the foreclosure proceeds, and other market data."[24] We did not address, however, whether Louisiana law requires the same method to be used to calculate the value of a vessel when the sale proceeds *exceed* the amount of necessaries liens. Nor need we decide the question in this case, for even assuming that the district court was required to consider "all relevant evidence," it engaged in that analysis and made a factual finding supported by the record.

Under our precedent, "the trier of fact is not bound by expert testimony."[25] While the court is not "at liberty to disregard arbitrarily the unequivocal, uncontradicted and unimpeached testimony of an expert witness," it may "weigh the credibility of the witness" and "substitute its own common-sense judgment for that of the experts."[26] The district court rejected First American's appraisers' valuations on the ground that the appraisals were done "well in advance of the vessel[s'] sales" and that the Ocean Jewel had lost value as a result of "Titan's abysmal business performance and . . . the passage

---

[24] *First Am. Bank*, 585 F.3d at 838.

[25] *Webster v. Offshore Food Serv., Inc.*, 434 F.2d 1191, 1193 (5th Cir. 1970).

[26] *Id.*; *see also Caboni v. General Motors Corp.*, 398 F.3d 357, 361 (5th Cir. 2005) ("The trier of fact . . . is not bound by expert testimony and is entitled to weigh the credibility of all witnesses, expert or lay.").

of time." This conclusion is certainly reasonable, especially considering that the Sapphire sold on the open market for $500,000, 75% less than the $2 million First American's appraiser claimed it was worth at the time of the bankruptcy. Aside from the appraisals, the only available evidence of the Ocean Jewel's value was the foreclosure sale price. As we made clear in the first appeal, that price is relevant evidence of the vessel's fair market value that the district court must consider.[27] It was not error, much less clear error, to find that the vessel's value equaled its foreclosure sale price under the circumstances.

## V

First American next contends that, even if the district court correctly calculated the value of the Ocean Jewel, it erroneously determined the amount due under the policy that insured that vessel. First American argues that the district court should have calculated the amount due under the Ocean Jewel policy by taking the value of the Ocean Jewel ($6,450,000) and subtracting from that figure the amount First American received from the foreclosure sale ($4,172,215). This calculation, First American asserts, would have yielded a figure of $2,277,785, an amount well in excess of the $1,162,287 to which the district court held First American was entitled.

As we have discussed, the Ocean Jewel policy does not provide for FATTIC to pay First American the difference between the value of the ship and the amount First American received from the foreclosure. Instead, the policy lists nineteen covered risks and provides that the insurer's liability shall not exceed "[t]he difference between the value of the Title as insured and the value of the Title subject to the defect, lien or encumbrance *insured against by this policy.*"

---

[27] *First Am. Bank*, 585 F.3d at 838.

No. 13-30888

Although the Ocean Jewel sold for $6,450,000, the bankruptcy court, with First American's consent, ordered that $1,110,000 be carved out for the benefit of the estate and that certain further funds be used to pay other creditors.  First American has not explained how this carve-out or the other payments fall into one of the nineteen covered risks or were otherwise insured under the policy.

## VI

As its last challenge to the district court's calculations, First American asserts that the court erroneously deducted $88,712 from the value of the Sapphire in calculating the amount due under the Shuttles policy.  The district court subtracted that sum on the ground that it equaled the extent of TBSR's credit-bid that "was designated as superpriority claims by the bankruptcy court."  Such claims, the court reasoned, were not covered under the policy if they were created after the policy's date of issuance.

First American does not dispute that the bankruptcy court granted TBSR a "superpriority" lien on the Sapphire or that such a lien is excluded from coverage.  It argues, however, that TBSR did not use the "superpriority" lien to obtain the vessel but instead relied on its maritime lien resulting from the provision of necessaries.  Because the policies cover such necessaries liens, the argument proceeds, the district court's deduction of $88,712 from the Sapphire's value was in error.

Based on our review of the record, TBSR does not appear to have asserted its "superpriority" lien in the *in rem* action against the Sapphire. Rather, in its pleadings, TBSR consistently stated that it had a claim to the vessel by virtue of its maritime lien from the provision of necessaries. Likewise, when it requested permission to bid on the Sapphire, it asked to be permitted to bid "in the amount of its maritime lien claims, $99,227.38." Nevertheless, even if the claims TBSR asserted against the Sapphire stemmed

from its maritime liens, that does not mean that the district court's finding as to the value of First American's covered loss is clearly erroneous.

As we have discussed, First American is due "the difference between the value of First American's ship mortgages when unencumbered and the value of First American's mortgages subject to the [covered] necessaries liens."[28] Because of the bankruptcy court's order, TBSR *could have* levied against the Sapphire on the basis of its first-priority lien. The value of First American's mortgages as unencumbered (by covered defects) was thus not the full value of the Sapphire since First American would not have been able to recover that amount. Rather, First American could only recover the full value of the Sapphire minus the extent of the uncovered liens on the vessel. First American does not dispute that TBSR held a first-priority lien for $88,712. Accordingly, the district court did not commit reversible error in deducting that figure to determine the amount due under the Shuttles policy.

## VII

In addition to challenging the district court's calculation of damages, First American argues that the court erred in finding that FATTIC did not act in bad faith in violation of Louisiana Revised Statutes § 22:1892. First American asserts that FATTIC acted arbitrarily in the processing of First American's claims because it did not remit payment under the Shuttles policy until months after this court's ruling in the first appeal.

Under Louisiana law, "A cause of action for penalties . . . requires a showing that (1) an insurer has received satisfactory proof of loss, (2) the insurer fails to tender payment within thirty days of receipt thereof, and (3)

---

[28] *Id.* at 837.

the insurer's failure to pay is arbitrary, capricious or without probable cause."[29] "The phrase 'arbitrary, capricious, or without probable cause' . . . describe[s] an insurer whose willful refusal of a claim is not based on a good-faith defense."[30] As the Louisiana Supreme Court has clarified, "an insurer need not pay a disputed amount in a claim for which there are substantial, reasonable and legitimate questions as to the extent of the insurer's liability or of the insured's loss."[31] Whether an insured's conduct is arbitrary or capricious "depends on the facts known to the insurer at the time of its action. . . . Because the question is essentially a factual issue, the trial court's finding should not be disturbed on appeal absent manifest error."[32]

The district court found that "FATTIC fulfilled most of its obligations under the policies to the Bank, and that it did so in as timely a fashion as could be expected in a case as complex as this." This finding is not manifestly erroneous. When Titan filed for bankruptcy, FATTIC promptly hired counsel to represent First American's interests. After counsel negotiated and settled the necessary lien claims on the Ocean Jewel down to approximately $1,162,287, FATTIC remitted that sum to First American. The payments for the Shuttles took longer, but that delay was due to the greater factual and legal uncertainty regarding the extent of coverage. Indeed, within three months of learning that the Emerald had generated net proceeds of approximately $445,137.50, FATTIC tendered that amount to the bank. That timeline was

---

[29] *Levy Gardens Partners 2007, L.P. v. Commonwealth Land Title Ins. Co.*, 706 F.3d 622, 635 (5th Cir. 2013) (alteration in original) (quoting *La. Bag Co. v. Audubon Indem. Co.*, 2008-0453, pp. 11-12 (La. 12/2/08); 999 So. 2d 1104, 1112-13).

[30] *Id.* (alteration in original) (quoting *La. Bag Co.*, 999 So. 2d at 1114).

[31] *La. Bag Co.*, 999 So. 2d at 1116.

[32] *Levy Gardens*, 706 F.3d at 635 (alteration in original) (quoting *Reed v. State Farm Mut. Auto. Ins. Co.*, 2003-0107, p. 14 (La. 10/21/03); 857 So. 2d 1012, 1021).

not arbitrary considering FATTIC paid the sum only fifteen days after discovery concluded. Although FATTIC refused to tender $500,000 to First American for the Sapphire, that refusal was based on good-faith claims regarding the extent of First American's coverage and the actual value of the vessel. Accordingly, the district court did not commit manifest error in finding that First American was not due any penalties under § 22:1892.

*    *    *

For the foregoing reasons, the judgment of the district court is AFFIRMED.