**MARBLE BANK, Plaintiff,**

v.

**COMMONWEALTH LAND TITLE INSURANCE COMPANY, Defendant.**

**No. 5:91–CV–16–BO.**

United States District Court, E.D. North Carolina, Western Division.

Jan. 19, 1996.

---

Charles E. Nichols, Jr., Charles B. Morris, Jr., Manning, Fulton & Skinner, Raleigh, NC, for plaintiff.

Diane P. Bishop, Larry B. Sitton, Smith, Helms, Mulliss & Moore, Greensboro, NC, for defendant.

## ORDER

TERRENCE WILLIAM BOYLE, District Judge.

This matter is before the undersigned on remand from the United States Court of Appeals for the Fourth Circuit. A bench trial was conducted on December 5, 1995 on the issue of damages. At trial the parties presented their arguments and submitted the case to the court on the existing record. Trial briefs as well as a joint appendix containing relevant portions of the record were filed with the court. Finding the value of the project to have been no greater than $7.5 million on May 14, 1990, the court holds that plaintiff suffered no damages. Judgment is therefore entered for defendant on the issue of damages.

This case arises out of a claim under a title insurance policy issued by defendant on the Pinehurst Plantation golf community and resort (project) in Pinehurst, North Carolina. The policy insured plaintiff's March 1989 $2 million construction loan lien secured by a third deed of trust (March deed). Plaintiff also held two prior deeds of trust, stemming from the $5 million acquisition loan (Acquisition deed) and a February 1989 loan of $2 million (February deed). As a result of a loss in priority of plaintiff's March deed to materialmen's liens in the amount of $3.5 million, plaintiff seeks to recover on the $2 million March policy.

The court first heard this case without a jury in 1991. Finding that the February and March title insurance policies were fraudulently procured on plaintiff's behalf and that plaintiff did not rely upon the policies, the court held that plaintiff could not recover. *Marble Bank v. Commonwealth Land Title Ins. Co.*, No. 91–16–CIV–BO (E.D.N.C. Sept. 12, 1994). On appeal the Fourth Circuit reversed, finding for plaintiff and remanding for a determination of plaintiff's damages. *Marble Bank v. Commonwealth Land Title Ins. Co.*, No. 94–2326, 1995 WL 470853 (4th

Cir. Aug. 14, 1995). The issue presented to this court therefore is whether plaintiff incurred any damages because the project's value exceeded the combined amounts due under the Acquisition and February deeds of trust.

### Discussion

The threshold issue presented to the court is which party bears the burden of proving the value of the project. Although a plaintiff normally bears the burden of proving its damages with reasonable certainty, plaintiff argues that defendant bears the burden in this case because the policy contained a specific exclusion for liens "resulting in no loss or damage to the insured claimant." (Policy Exclusion 3(c)). North Carolina law does allocate the burden to the insurance company when it refuses to pay the insured under an exclusion in a policy. *Kirk v. Nationwide Mut. Ins. Co.*, 254 N.C. 651, 654 (1961). Exclusion 3(c) is, however, nothing more than the flip side of defendant's primary obligation under the contract: to compensate plaintiff for any "loss or damage by reason of loss of priority." Thus, plaintiff bears the burden of proving its loss by establishing that the value of the project exceeded the obligations under the first two deeds of trust.

■ Before examining the evidence related to the project's value, the court must determine the relevant date for measurement of that value. Without deciding the matter, the circuit court assumed that the appropriate date was the foreclosure date. *Marble Bank v. Commonwealth Land Title Ins. Co.*, No. 94–2326, slip op. at 13 n. 6, 1995 WL 470853 (4th Cir. Aug. 14, 1995).

Although the parties agree that the project should be valued at the time plaintiff suffered a loss, the parties differ as to that date. Plaintiff argues that it incurred the loss on March 6, 1989, the date of the loan, because that is when it purchased the interest being insured. In the alternative, plaintiff contends that January 22, 1990 is the latest appropriate date for valuation because that is the day plaintiff submitted its claim under the policy. Defendant responds that plaintiff

did not suffer its alleged loss until the foreclosure sale on May 14, 1990.

As the parties acknowledge, no North Carolina authority exists on this issue. In the court's view, plaintiff did not suffer a loss until it foreclosed on the project. Since a lender suffers loss only if the note is not repaid, the discovery of an insured-against lien does not trigger recognition of that loss. *Karl v. Commonwealth Land Title Ins. Co.*, 20 Cal.App.4th 972, 24 Cal.Rptr.2d 912, 919–20 (1993). Only the completion of foreclosure signifies that a lender will not collect on its note. Moreover, as is typical, plaintiff selected the foreclosure date, thereby controlling to the extent possible the amount of its loss. Finally, plaintiff's stipulation, Pretrial Order at 31, and Grover's testimony that the project's value had not declined much from May 1989 to May 1990 indicates that, in plaintiff's view, there should be little difference between measuring the value on January 22, 1990 and on May 14, 1990. Thus, the court finds May 14, 1990 to be the appropriate date for valuation of the project.

In determining the value of the project, the court has carefully reviewed the record established at the first trial. In particular, the court has weighed the four pieces of evidence relating to value: (1) the testimony of Edward J. Grover, president of Marble Bank, and supporting materials; (2) the foreclosure sale of the project; (3) the sale of the project to Tri–City, Inc.; and (4) plaintiff's accounting treatment of the project.

■ Fair market value of property is "the amount which would be agreed upon as a fair price by an owner who wishes to sell but is not obliged to do so and a buyer who wishes to buy but is not compelled to do so." *Huff v. Thornton*, 287 N.C. 1, 12, 213 S.E.2d 198 (1975) (quoting jury instructions approvingly). Applying this rule to the instant case, the best evidence of fair market value is the sale of the project for a price of $7.5 million to Tri–City in July 1990, just two months after the foreclosure.[1] As Grover testified, the transaction was negotiated at arms length over a period of seven to eight

---

1. In fact, because the purchase price was paid over 18 months without interest, the time value of the money in July 1990 was between $6.5 and $7 million.

months, beginning well before the foreclosure sale. During that time period, plaintiff received at least five offers, all in the range of $7 to $7.5 million despite the asking price of $10 million. The bank did consider an "offer" of $10 million from a broker, but rejected it because plaintiff felt there were "too many maybes" involved to take the project off the market. Furthermore, during negotiations plaintiff's business advisor, Jack Skagerberg of Coastal Realty Partners, drafted a letter to be sent to Tri–City confirming that "[a]t a purchase price of $7,500,-000, [plaintiff was] accepting the current market value of the asset." Draft Letter from Jack Skagerberg to Woody Davis, Tri–City, Inc., July 27, 1990, at 2.

Plaintiff argues that Tri–City's purchase price of $7.5 million is not reflective of fair market value because the transaction was a distress sale, meaning that plaintiff was under undue pressure to sell. Notwithstanding plaintiff's desire to sell the project and realize its losses as quickly as possible, circumstances surrounding the sale indicate that it was a voluntary transaction consummated on the open market by two parties acting in their own self-interests. Plaintiff received offers from at least five potential buyers. Plaintiff openly marketed the project from January 1990. Plaintiff responded to market conditions by reducing the asking price from $16 to $12 to $10 million, finally accepting $7.5 million paid over time. The purchaser, Tri–City, Inc., had a significant incentive to insure that it succeeded in its bid to purchase the project because it owned the adjacent Pinehurst National golf community and resort. In fact, Tri–City merged the two developments.

Plaintiff further argues that the court should accept Grover's testimony that the project was worth at least $10 million. Although Grover visited the project, oversaw the loans, and has extensive experience with commercial realty, he did not conduct, nor was he qualified to conduct, a formal appraisal of the project. In his testimony, Grover relied on a market evaluation by Robert Charles Lesser & Company, dated January 12, 1990, which concluded that gross sales from the project would amount to $27 million over a seven to eight year sell-out period, assuming completion of the project. As admitted by Grover, however, the market evaluation estimated that completion costs, including marketing of the properties, would amount to over $26 million. Thus, the market analysis fails to support Grover's contention of a $10 million value. Plaintiff also argues that Grover's testimony is supported by an appraisal by the Ratchford Group on April 5, 1989, which plaintiff contends valued the project in "as is" condition at $17.9 million. Skagerberg warned, however, that "developer inspired appraisals tend to have inherent self interest" and that "the appraisal [did] not provide enough detail on the actual sale of lots" in the Pinehurst National project used for comparison purposes. Coastal Realty Partners, Pinehurst Plantation Business Plan (November 27, 1989). Grover testified that plaintiff relied on Skagerberg's assessment of the project's value and followed his recommendation to commission the Charles Lesser market evaluation. Finally, Grover concluded that the project must be worth at least $10 million because $5 million was spent to buy the property, $5 million was lent by plaintiff for construction, and $3 million in unpaid contractor's bill existed at foreclosure. Certainly, these informal calculations are insufficient to constitute a valid appraisal of the project's value. Thus, while the court finds much of Grover's testimony pertaining to the underlying facts credible, it does not accept his conclusions regarding valuation.

Plaintiff also argues that the price it paid for the project at the foreclosure sale, $10.2 million, confirms that the project was worth at least $10 million. Although foreclosure price may be evidence of fair market value, plaintiff's bid on the project represented little more than a credit bid. As a result of a settlement with the original developer of the project, the note secured by plaintiff's March deed of trust was non-recourse. Without the possibility of a deficiency action on that note, plaintiff had no other option but to bid up to the full amount of the three notes it owned on the project if it wanted any opportunity to recover on the March note. Furthermore, no other bids were submitted at the sale. Thus, plaintiff's foreclosure bid, unlike that of

a third party in a similar sale, is not reliable evidence of market value.

Finally, plaintiff's accounting treatment of the project supports a valuation of between $7 and $7.5 million. Plaintiff valued the project at $7.3 million on its accounting books. This accounting treatment was required under Generally Accepted Accounting Principles (GAAP) which directed plaintiff to write the project down to the lesser of plaintiff's investment, approximately $12 million at the time, or fair market value. *See* Financial Accounting Standards Board Statement No. 15, Accounting by Debtors and Creditors for Troubled Debt Restructurings ¶¶ 13, 28, 35 (June 1977). As a result, plaintiff's 1990 annual report explained that the project had been written down to its "estimated current market value."

## Findings of Fact

1. The best evidence of market value of the project is the purchase price of $7.5 million paid by Tri–City, Inc. for the project over eighteen months without interest.

2. The transaction was negotiated at arms length by two willing parties.

3. During the seven or eight months of negotiations with Tri–City, plaintiff received five offers in the range of $7 to $7.5 million.

4. Plaintiff rejected a conditional offer of $10 million from a broker because the offered appeared tentative.

5. Plaintiff recognized that the fair market value of the property in 1990 was approximately $7.5 million as reflected in its accounting treatment of the project after foreclosure, its explanation of that treatment in its 1990 annual report, and a July 27, 1990 draft of a letter response to Tri–City.

6. Plaintiff responded to the market by reducing its asking price from $16 to $12 to $10 million during the first half of 1990, finally accepting $7.5 million from Tri–City.

7. Much of the testimony of Edward J. Grover, president of Marble Bank, pertaining to the underlying facts is credible, but the court does not accept his conclusions regarding valuation.

8. Plaintiff's bid of $10.2 million at the foreclosure sale does not represent fair market value in light of the absence of other bids by third parties. Furthermore, plaintiff had nothing to lose by bidding up to the value of all three notes if it wanted any opportunity to recover on the March note.

9. In light of the evidence, the fair market value of the project on May 14, 1990 was no more than $7.5 million.

## Conclusions of Law

1. Plaintiff bears the burden of proving its damages by establishing that the value of the project exceeded the obligations under the first two deeds of trust.

2. The appropriate time for measuring plaintiff's damages, i.e., the value of the project, is May 14, 1990, the date of the foreclosure sale.

3. Fair market value of property is the amount which would be agreed upon as a fair price by an owner who wishes to sell but is not obliged to do so and a buyer who wishes to buy but is not compelled to do so.

4. Plaintiff has failed to establish any damages because the fair market value of the property on May 14, 1990 did not exceed the combined amounts due under the Acquisition and February deeds of trust.

## Conclusion

In light of the evidence submitted to the court on the issue of damages, the court finds that the project was worth no more than $7.5 million on May 14, 1990. Because the project's value did not exceed the combined amounts due under the Acquisition and February deeds of trust, plaintiff did not incur any damages. Accordingly, the court enters judgment for defendant on the issue of damages. Defendant is entitled to recover its costs.