IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

FIRST AMERICAN TITLE INSURANCE COMPANY,
A CALIFORNIA CORPORATION,
*Plaintiff/Appellee,*

*v.*

JOHNSON BANK, A WISCONSIN BANK REGISTERED IN ARIZONA,
*Defendant/Appellant.*

No. CV-15-0244-PR
Filed June 13, 2016
**Amended by Order filed August 18, 2016**

Appeal from the Superior Court in Maricopa County
The Honorable Robert H. Oberbillig, Judge
No. CV2013-003634
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division One
237 Ariz. 490, 353 P.3d 370 (App. 2015)
**VACATED**

COUNSEL:

Mark A. Nadeau, Courtney G. Saleski, (argued), DLA Piper LLP (US), Phoenix, Attorneys for First American Title Insurance Company

William G. Ridenour, Timothy Berg (argued), Janice Procter-Murphy, Fennemore Craig, P.C., Phoenix, Attorneys for Johnson Bank

Dennis I. Wilenchik, Tyler Q. Swensen, Wilenchik & Bartness, P.C., Phoenix, Attorneys for Amici Curiae Equity Income Partners LP and Galileo Capital Partners, Ltd.

Ari Ramras, Ramras Legal, PLC, Phoenix, Attorney for Amicus Curiae Land Title Association of Arizona

―――――――――

VICE CHIEF JUSTICE PELANDER authored the opinion of the Court, in which JUSTICES BRUTINEL and BOLICK, and JUDGE ECKERSTROM* joined, and CHIEF JUSTICE BALES dissented.

―――――――――

VICE CHIEF JUSTICE PELANDER, opinion of the Court:

**¶1**         This case presents the question of how to calculate damages under a lender's title insurance policy that failed to disclose encumbrances substantially affecting the value of the property and thwarting its intended use.  Because the policy itself does not specify a valuation date, we are asked to determine the appropriate date from which to measure the insured lender's loss.  We hold that when an undisclosed title defect prevents the known, intended use of the property and causes the borrower to default on the loan, the lender's diminution-in-value loss should be calculated as of the date the title policy was issued rather than as of the date of foreclosure.  Because the record does not establish that the title defect caused the borrowers' default and the ensuing foreclosure, we remand for further proceedings on that issue.

**I.**

**¶2**         In 2005 and 2006, First American Title Insurance Company issued two title insurance policies to Johnson Bank for two properties that secured the bank's loans in the total amount of $2,050,000.  The policies failed to list certain covenants, conditions, and restrictions ("CC&R's") that allegedly prohibited commercial development on either parcel.  The property owners defaulted on their loan obligations to Johnson Bank, allegedly because they had intended to develop the properties and were prevented from doing so by the CC&R's.  Based on the undisclosed CC&R's, the owners successfully sued First American to recover damages under their owners' title insurance policies.

―――――――――

*         Justice Ann A. Scott Timmer has recused herself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, the Honorable Peter Eckerstrom, Chief Judge of the Arizona Court of Appeals, Division Two, was designated to sit in this matter.

**¶3** In 2010, the properties were sold at a trustee's sale. Johnson Bank purchased the two parcels with a credit bid of $102,000. In 2011, Johnson Bank notified First American of claims under its lender's title insurance policies, asserting that the CC&R's prevented both properties from being developed for commercial purposes, and that the CC&R's were not listed exceptions to coverage under the policies.

**¶4** The parties agreed to arbitrate the damage claims but could not agree on the date for calculating the alleged diminution in value of the subject parcels. Johnson Bank argued that the date of the loans should be used to calculate damages. First American argued that damages should be based on the value of the properties at the time of foreclosure, after the real estate market had precipitously declined.

**¶5** Both parties sought declaratory relief in superior court. On the parties' cross-motions for summary judgment, the court granted judgment in favor of First American, ruling that the parcels should be valued as of the foreclosure date.

**¶6** The court of appeals reversed, holding that "in the absence of a specified date of comparative valuation identified in the policies, . . . the date to measure any diminution in property value is the date of the loan." *First Am. Title Ins. Co. v. Johnson Bank*, 237 Ariz. 490, 494 ¶ 18, 353 P.3d 370, 374 (App. 2015). The court reasoned that because First American failed to discover and timely disclose the CC&R's, the policy was breached when the loans were made. *Id.* at ¶ 17. Accordingly, the court remanded the case for entry of judgment in favor of Johnson Bank on the valuation-date issue. *Id.* at ¶ 18.

**¶7** We granted review because the case presents an issue of first impression in Arizona and of statewide importance. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. § 12-120.24.

## II.

**¶8** We review a summary judgment de novo, viewing the facts in the light most favorable to the party against whom judgment was entered. *See* Ariz. R. Civ. P. 56(a); *BMO Harris Bank, N.A. v. Wildwood Creek Ranch, LLC*, 236 Ariz. 363, 365 ¶ 7, 340 P.3d 1071, 1073 (2015). "We review

3

de novo the interpretation of insurance contracts," *First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 218 Ariz. 394, 397 ¶ 8, 187 P.3d 1107, 1110 (2008), and construe provisions in such contracts according to their plain and ordinary meaning. *Sparks v. Republic Nat. Life Ins. Co.*, 132 Ariz. 529, 534, 647 P.2d 1127, 1132 (1982). We also interpret contracts so as to fulfill the parties' intent. *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 152, 854 P.2d 1134, 1138 (1993).

**A.**

¶9 The title insurance policies at issue here are standard form American Land Title Association ("ALTA") loan policies. The amounts insured corresponded to the total amount of Johnson Bank's loans ($2,050,000). Subject to various exclusions, exceptions, and conditions, the policies insure "against loss or damage . . . sustained or incurred by the Insured by reason of . . . [a]ny defect in or lien or encumbrance on the title." The policies do not define the term "loss or damage," but require the insured claimant to timely notify the insurer and provide proof of any claimed loss or damage, including the basis of the claim and the "basis of calculating the amount of the loss or damage."

¶10 The policies do not specify the date to be used in calculating loss or damage. In pertinent part, the policies provide:

7. DETERMINATION AND EXTENT OF LIABILITY

This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

(a) The liability of the Company under this policy shall not exceed the least of:

. . .

(iii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against this policy.

4

¶11    Both parties argue that this policy language is unambiguous and supports their respective view.  Johnson Bank asserts that the phrase "as insured" in § 7(a)(iii) refers to "when the property is to be valued" and means that, for damage-calculation purposes, "the property should be valued as of the date that the insurance policy issued."

¶12    First American counters that the phrase "as insured," used throughout the policy, refers only to how the property interest is insured, i.e., the policy's conditions and exceptions.  The policy is not ambiguous, First American argues, merely because it does not specify a date for calculating the loss.  *See First Tenn. Bank, Nat. Ass'n v. Lawyers Title Ins. Corp.*, 282 F.R.D. 423, 427 (N.D. Ill. 2012) (stating that the absence of explicit text establishing a valuation date "does not necessarily mean that the provision is ambiguous").  According to First American, the policy implicitly establishes the date of foreclosure as the applicable valuation date because the policy indemnifies a loss from an undisclosed title defect only after the lender forecloses on the property, and thus the insured lender incurs no loss until then.

¶13    The court of appeals found the policy language in § 7(a)(iii) ambiguous because it does not identify "the date the loss is to be calculated." *First Am. Title*, 237 Ariz. at 493 ¶ 12, 353 P.3d at 373.  Under the facts of this particular case, we agree.  Because the relevant provision is reasonably susceptible to differing interpretations, and because no other evidence establishes any particular meaning mutually intended by the contracting parties, the policy's language alone does not resolve the valuation-date issue before us today.  *See State Farm Mut. Auto. Ins. Co. v. Wilson*, 162 Ariz. 251, 258, 782 P.2d 727, 734 (1989) (stating that ambiguity exists when a policy "presents conflicting reasonable interpretations"); *cf. Taylor*, 175 Ariz. at 153–54, 854 P.2d at 1139–40 (discussing ambiguity determinations, parol evidence rule, and court's "primary objective—to enforce the contract as intended by the parties").

¶14    First American nonetheless argues that because the lender must foreclose on the property to incur and claim a loss, the date of foreclosure is the only reasonable valuation date.  *See, e.g., Marble Bank v. Commonwealth Land Title Ins. Co.*, 914 F. Supp. 1252, 1254 (E.D.N.C. 1996) ("In the court's view, [the insured lender] did not suffer a loss until it

foreclosed on the project. Since a lender suffers loss only if the note is not repaid, the discovery of an insured-against lien does not trigger recognition of that loss."). First American's argument, however, conflates two concepts. Although the insured lender's exact loss might not be calculable until foreclosure occurs, that calculation can be made using the property's value, with and without the defect, as of the policy date to determine the actual loss on the date of foreclosure.

¶15        In addition, the policy contains several contractual prerequisites that do not directly bear on damage valuation. For instance, the lender must submit a written claim and proof of loss to the title company after discovering a title defect, and the title insurance company must decide whether it will exercise its rights under the policy to remove or cure the title defect instead of paying money damages. Such policy prerequisites, however, do not dictate the valuation date. *Cf. Swanson v. Safeco Title Ins. Co.*, 186 Ariz. 637, 641–42, 925 P.2d 1354, 1358–59 (App. 1995) (concluding that the damage-valuation date under an owner's title insurance policy was the date the title defect was discovered).

¶16        We recognize that other courts have found the same or similar policy clause (ALTA Loan Policy § 7(a)(iii)) unambiguous in circumstances different from those presented here. *See, e.g.*, *First Am. Bank v. First Am. Transp. Title Ins. Co.*, 759 F.3d 427, 430–33 (5th Cir. 2014) (noting that the title defect was a maritime improvement lien); *Associated Bank, N.A. v. Stewart Title Guar. Co.*, 881 F. Supp. 2d 1058, 1062–63 (D. Minn. 2012) (noting that the title defect was an undisclosed senior lien); *First Tenn. Bank*, 282 F.R.D. at 427 (same); *Marble Bank*, 914 F. Supp. at 1254 (same). Unlike this case, those cases involved undisclosed senior liens in which courts found that the policy unambiguously requires using the date of foreclosure as the valuation date.

¶17        When the title defect is an undisclosed lien, the foreclosure date might well be the appropriate valuation date because the lender's damage results from not having priority in the foreclosure proceeds. *See First Tenn. Bank*, 282 F.R.D. at 427; *see generally* Christopher B. Frantze, *Equity Income Partners LP v. Chicago Title Insurance Co. and Recovery Under A Lender's Title Insurance Policy in A Falling Real Estate Market*, 48 Real Prop. Tr. & Est. L.J. 391, 392 (2013) (surveying cases). But to the extent the foregoing cases suggest that, regardless of circumstances, lenders' title insurance policies like that at issue here clearly establish the date of

foreclosure as the only damage-valuation date because the existence and extent of any loss is unknown before then, we find them unpersuasive.

**¶18** In any event, the title defect in this case is not an undisclosed lien, but is instead undisclosed CC&R's that allegedly prevented the borrowers/owners from developing the property, which in turn allegedly caused them to default on their loans. The policy does not clearly identify the appropriate valuation date for calculating the lender's loss in these circumstances, and thus the court of appeals did not err in finding the policy ambiguous on that issue. *See Leo Eisenberg & Co., Inc. v. Payson*, 162 Ariz. 529, 532, 785 P.2d 49, 52 (1989) (noting that a contract is ambiguous when it "can be reasonably construed in more than one manner").

**B.**

**¶19** "If a clause appears ambiguous, we interpret it by looking to legislative goals, social policy, and the transaction as a whole. If an ambiguity remains after considering these factors, we construe it against the insurer." *Action Acquisitions*, 218 Ariz. at 397 ¶ 8, 187 P.3d at 1110 (citation omitted).

**1.**

**¶20** Turning first to any pertinent legislative goals, like the court of appeals, we find "no statute or other binding legal precedent in Arizona that determines the starting date of comparative valuation of property for calculating covered losses under a lender's title insurance policy." *First Am. Title*, 237 Ariz. at 492 ¶ 10, 353 P.3d at 372. Under the relevant statute, "[t]itle insurance" means:

> insuring, guaranteeing or indemnifying owners of real property or others interested therein against loss or damage suffered by reason of liens, encumbrances upon, defects in or the unmarketability of the title to such property, guaranteeing, warranting or otherwise insuring the correctness of searches relating to the title to real property, or doing any business in substance equivalent to any of the foregoing.

A.R.S. § 20-1562(8); *see also* § 20-1562(11) ("'Title insurance policy' means a written statement or contract by means of which title insurance liability is accepted."). A title "commitment" is defined as:

> [A] report that is furnished in connection with an application for title insurance and that offers to issue a title insurance policy subject to the stated exceptions set forth in the report or incorporated by reference. The reports are not abstracts of title and the rights, duties and responsibilities relating to the preparation and issuance of an abstract of title do not apply to the issuance of a report. The report is not a representation as to the condition of title to real property but does constitute a statement of the terms and conditions on which the issuer is willing to issue its title insurance policy if the offer is accepted.

A.R.S. § 20-1562(5).

**¶21** Under this statutory scheme, a party cannot reasonably rely on a title commitment as a representation on the condition of title to the property. *Cf. Centennial Dev. Grp., LLC v. Lawyer's Title Ins. Corp.*, 233 Ariz. 147, 149–50 ¶¶ 8–9, 310 P.3d 23, 25–26 (App. 2013) (stating that § 20-1562 "effectively bar[s] a common-law claim against an insurer whose title commitment fails to identify a cloud on title," and that a title commitment issued in connection with the title company's policy "was not a representation of the condition of the title to the property" and could not support a negligent misrepresentation claim). A party desiring to rely on a representation on the quality of title must obtain an abstract of title. *See* A.R.S. § 20-1562(1) (defining "abstract of title" as "a written representation that is provided pursuant to a written or oral contract that is intended to be relied on by the person who has contracted for the receipt of the representation").

**¶22** First American asserts that the court of appeals erred by establishing the date of the loans as the valuation date because only title commitments had been issued when Johnson Bank made the loans, and the bank could not have reasonably relied on title commitments as a representation of the title. But Johnson Bank's claim is not based on any alleged misrepresentation, title commitment, or abstract of title; nor is the bank seeking or entitled to reliance damages. Rather, Johnson Bank has

8

alleged only a breach of the title insurance policy, a contract claim for which proof of reliance is not required. *See Graham v. Asbury*, 112 Ariz. 184, 185, 540 P.2d 656, 657 (1975) (identifying the elements of a breach-of-contract claim as: (1) the existence of a contract; (2) breach; and (3) resulting damages). In short, no identifiable legislative goals affect or resolve the issue before us.

**2.**

¶23        We next consider any pertinent social policies and the parties' transaction as a whole. *See Action Acquisitions*, 218 Ariz. at 397 ¶ 8, 187 P.3d at 1110. Because these topics implicate overlapping considerations, we consider them together.

¶24        In this case, social policies and fundamental aspects of the parties' transaction support using the date of the policy as the valuation date. The insurer has complete control of the title defects against which it insures; it is in the best position to avoid such risks and prevent resulting loss by conducting thorough and accurate title searches. Here, First American's deficient title search resulted in its failure to discover and disclose the adverse CC&R's that had been recorded against the property in 1985. That encumbrance prevented the borrowers/owners' intended use of the property and consequently deprived Johnson Bank of the benefit of not only its bargain with the borrowers to whom it loaned substantial sums, but also its bargain with First American.

¶25        Significantly, the insurance premium First American charged was based on the amount insured, which was the same amount as Johnson Bank's loans and corresponding security interest in the properties. And, under its policies, First American agreed to pay up to that amount for any "loss or damage . . . sustained or incurred by [Johnson Bank] by reason of . . . [a]ny defect in or lien or encumbrance on the title." Using the foreclosure date as the damage-valuation date would allow the insurer to profit from a depreciating market even when the title defect caused the borrower to default. *See* Barlow Burke, *Law of Title Insurance* § 7.04 (3d ed. Aspen Publishers 2004) (noting that if an insurer collects a premium based on the loan's face amount and then, when title fails in a falling market, argues the decrease resulted from market conditions and thus "seeks to pay less than the amount of the insurance purchased and the loss of capital sunk

in the purchase price," "the insurer is in a 'tails I win, heads you lose' position").

¶26      In addition, by using the date of the policies as the valuation date in circumstances such as these, a title insurance company can accurately evaluate if it should exercise its rights under the policy to cure the title defect or pay money damages. Finally, using the foreclosure date when the title defect caused the borrower to default would unfairly allow the title company to avoid the insured's actual, resulting consequential damages. *Id.* ("The choice of a date for measuring damages should not provide the insurer with an opportunity to shield its eyes from the insured's actual, economic, and consequential losses.").

¶27      In evaluating relevant social policy and the transaction as a whole, we also must consider the assessment and allocation of risk under circumstances which, as here, include a downturn in the real estate market. First American argues that the court of appeals improperly allocated the risks of a declining market and a borrower's default. Under the policies, First American did not expressly agree to indemnify or otherwise insure against the risk of a drop in the real estate market. But the policies also do not exclude coverage for loss resulting partly from such risk, nor do we hold that a title company, as a general commercial matter, bears that risk.

¶28      When an undisclosed, material title defect completely frustrates the borrowers/owners' intended use of the property and directly causes their default and the subsequent foreclosure, an insured lender's recoverable damages may include loss resulting from a declining real estate market. We acknowledge that, for purposes of § 7(a)(iii) of the policy, measuring the difference in value at the time of policy issuance for a loss that does not occur until foreclosure in a down market may effectively shift to the title insurer part of the loss attributable to the market downturn (which could occur irrespective of any title defect or error in the title search). Under these particular circumstances, however, that consequence offends neither the policy language nor the relevant, identified social policies. As a leading treatise has explained, reasons that support using the policy date to measure the lender's loss in a falling market include: "the purpose of the policy from the standpoint of the insured is future indemnification;" and "the policy date is consistent with fully compensating the insured for his or her 'actual losses' under the policy." *Id.*

10

¶29          Banks, of course, are in the business of assessing the risk that their loans will not be repaid, including the risk of market declines. But that risk assessment occurs when banks enter into a loan contract, not when a default and foreclosure occur sometime later. Likewise, although a lender bears some inherent risk of a possible market downturn, the value of the lender's security interest — again, taken at the time a loan is made — is the lender's hedge against that risk. Moreover, and importantly, owners are less likely to default on the loan, even in a declining market, if their property can be developed as contemplated. This too is a consideration for lenders at the time a loan is made. Thus, in determining damages caused by First American's incomplete title search under the facts presented here, social policy does not preclude using the date the policies were issued as the valuation date.

¶30          Finally, the lack of a specific valuation date in title insurance policies allows a case-by-case approach to value the insured's loss. Joyce Palomar, 1 *Title Ins. Law* § 10:16 (2015 ed.) ("Because ALTA policies have not specified the date the value of the property is to be assessed to measure an insured's loss, courts need to determine the insured's actual loss in the particular circumstances."). If the foreclosure date were the universal valuation date to be used regardless of circumstances, then courts and the parties could not evaluate the insured's actual loss in a particular case. And if title insurers desire to avoid all uncertainty by establishing the foreclosure date or specifying some other damage-valuation measure to uniformly apply in all situations, they can modify their policies accordingly. In sum, neither social policy nor the transaction as a whole militates against using the date of policy issuance as the date for measuring damages under § 7(a)(iii).

¶31          Contrary to First American's assertion, this reasoning and conclusion do not convert its indemnification policy into a mortgage insurance policy or a guarantee of title. "Title insurance does not guarantee perfect title; instead, it pays damages, if any, caused by any defects to title that the title company should have discovered but did not." *Swanson*, 186 Ariz. at 641, 925 P.2d at 1358; *see Falmouth Nat. Bank v. Ticor Title Ins. Co.*, 920 F.2d 1058, 1063 (1st Cir. 1990) ("[W]hat is insured is the loss resulting from a defect in the security."). Consequently, the mere existence of a title defect is not a breach. *See In re W. Feliciana Acquisition, L.L.C.*, 744 F.3d 352, 359 (5th Cir. 2014).

11

¶32          Indisputably, First American's policy only agrees to indemnify against actual monetary loss or damage; it is not "guarantee of title." *See First Am. Bank*, 759 F.3d at 433 (noting that title insurance does not "guarantee either that the mortgaged premises are worth the amount of the mortgage or that the mortgage debt will be paid") (internal citation omitted)*; Guarantee of Title*, Black's Law Dictionary (10th ed. 2014) ("A warranty that the title to a piece of real property is vested in a particular person, given by a title company or abstract company, and based on a title searcher's opinion of the status of the property's title.").

¶33          Using the date of the policy does not convert the indemnification policy into a guarantee of title. First, the insurer will be liable only if the loss results due to a discoverable defect or encumbrance on the title. *Swanson*, 186 Ariz. at 641, 925 P.2d at 1358. Absent such a defect in title, there would be no insured loss. Second, under the policy, the lender must demonstrate an actual loss. *See generally* Eric M. Larsson, 46 Causes of Action 2d 605, §§ 3–4 (originally published in 2010) (discussing the differences between a claim under a title insurance policy and related causes of actions). Third, the title insurance policy applies only if a title defect caused the insured's loss. *Cf. Feliciana Acquisition*, 744 F.3d at 359 (noting that the title defect must cause the loss). As Johnson Bank acknowledges, "the insurer would have no liability if the borrower defaulted because of personal circumstances wholly unrelated to a defect in title or if the real estate market fell resulting in a default by the borrower when there was no defect in title." Using the date of policy issuance as the valuation date under the circumstances here does not change the nature or scope of the policy's coverage.

### 3.

¶34          In support of its holding, the court of appeals relied largely on *Equity Income Partners v. Chicago Title Insurance Co.*, 2012 WL 3871505 (D. Ariz. Sept. 6, 2012), an unpublished federal district court decision, which in turn embraced the reasoning of *Citicorp Savings of Illinois v. Stewart Title Guaranty Co.*, 840 F.2d 526 (7th Cir. 1988). *See First Am. Title*, 237 Ariz. at 493–94 ¶¶ 13–14, 353 P.3d at 373–74. First American argues that the court of appeals erred in adopting that "minority view" and should have instead followed the "majority view" of cases such as *First American Bank*, 759 F.3d at 432 (noting that "a majority of courts from other jurisdictions have held

that, in the absence of specific policy language, a title insurer's liability to a mortgagee should be measured using the foreclosure date").

¶35        The "majority view" identified by First American largely involved situations where the title defect was an undisclosed senior lien. *See, e.g.*, *First Am. Bank*, 759 F.3d at 433 (mentioning that the title defect was a maritime improvement lien); *Associated Bank*, 881 F. Supp. 2d at 1063 (noting that the title defect was an undisclosed senior lien); *First Tenn. Bank*, 282 F.R.D. at 427 (same); *Marble Bank*, 914 F. Supp. at 1254 (same).  As noted above, this case does not involve an undisclosed senior lien, and therefore those cases are not persuasive or particularly helpful.

¶36        The "minority view," as characterized by First American, involved situations where, as here, a total failure of title occurred and courts used the loan date to measure damages.  *See, e.g.*, *Citicorp*, 840 F.2d at 529–30 (discussing that the insured's lien was unenforceable *ab initio*); *In re Evans*, 460 B.R. 848, 895–99 (Bankr. S.D. Miss. 2011) (discussing that the lender had no right in the property).  The *Citicorp* court reasoned that the policy was breached when the lender made the loan.  840 F.2d at 530.  The district court in *Equity Income Partners* used that same rationale when the title defect rendered the property essentially worthless because it lacked ingress and egress.  *See* 2012 WL 3871505 at *4 (using the date of the loan for damage-valuation purposes, noting that "because the policy was breached at the time of the loan, the title insurer should bear any risk of market value decline in the property at that time") (internal citation and punctuation omitted).  Thus, those cases that First American characterizes as representing the "minority view" actually involve different reasoning anchored in a different species of breach — the very species which, Johnson Bank maintains, occurred here.  In sum, the case law from other jurisdictions does not influence the relevant social policies for determining the appropriate valuation date in this case.

**4.**

¶37        "In interpreting an insurance policy, we apply 'a rule of common sense' thus, 'when a question of interpretation arises, we are not compelled in every case of apparent ambiguity to blindly follow the interpretation least favorable to the insurer.'" *Employers Mut. Cas. Co. v. DGG & CAR, Inc.*, 218 Ariz. 262, 264 ¶ 9, 183 P.3d 513, 515 (2008) (quoting *Wilson*, 162 Ariz. at 257, 782 P.2d at 733).  Rather, "[t]he 'ambiguity' rule

applies only after the court is unable to determine how the language of the policy applies to the specific facts of the case." *DGG & CAR*, 218 Ariz. at 264 ¶ 9, 183 P.3d at 515 (quoting *Preferred Risk Mut. Ins. Co. v. Lewallen*, 146 Ariz. 83, 85, 703 P.2d 1232, 1234 (App. 1985)). Our evaluation of legislative goals, social policies, and the transaction as a whole does not eliminate the policy's ambiguity or resolve the question before us. Accordingly, we will construe the policy, and particularly § 7(a)(iii), against First American. *See Action Acquisitions*, 218 Ariz. at 397 ¶ 8, 187 P.3d at 1110. So construed, the policy implicitly permits using the policy-issuance date as the date for calculating damages under § 7(a)(iii), if the title defect caused the borrowers/owners to default on Johnson Bank's loans.

**C.**

¶38      The dissent advocates using the foreclosure date to measure Johnson Bank's loss. *Infra* ¶¶ 50, 58. We are unpersuaded because the dissent rests on incorrect premises, uncontested but inapplicable legal principles, and inapposite out-of-state cases. According to the dissent, using the policy-issuance date to measure the bank's loss "does not comport with the expressed intent of the parties." *Infra* ¶ 61. But how is the parties' intent on the sole relevant issue here knowable or discernible when, as the dissent acknowledges, the policy is "facially ambiguous" regarding the proper damage-valuation date to use in this case? *Infra* ¶ 50. And the record does not reflect, nor does the dissent cite, any extrinsic parol evidence "to explain what the parties truly may have intended" on that issue. *Taylor*, 175 Ariz. at 154, 854 P.2d at 1140.

¶39      The dissent also mistakenly asserts that we "impute[] duties to the title insurer that are inconsistent with the policy itself and Arizona's statutory framework." *Infra* ¶ 52. In its ALTA form policy, however, First American broadly agreed to indemnify "against loss or damage . . . sustained or incurred by the Insured by reason of . . . [a]ny defect in or lien or encumbrance on the title." And again, as the dissent concedes, the policy does not clearly identify a valuation date for calculating the insured's loss. Our analysis and conclusion do not conflict with any of the policy's provisions.

¶40      Contrary to the dissent's assertion, neither Johnson Bank's contract claim nor our analysis and determination of the appropriate loss-valuation date contravene Arizona's statutory framework. *Infra* ¶¶ 52, 55.

As noted above, *supra* ¶ 22, the contract claim at issue here is based solely on the title insurance policy, not on an "abstract of title," misrepresentation, or any other tort theory.

**¶41**        Although it acknowledges that First American's policy is ambiguous, the dissent does not convincingly analyze the relevant social policies and the parties' transaction as a whole, as we must do given the policy's ambiguity. *Action Acquisitions*, 218 Ariz. at 397 ¶ 8, 187 P.3d at 1110. Instead, the dissent incorrectly asserts that we impose common law and statutory duties on First American that indisputably do not exist here.

**¶42**        In support of its position, the dissent relies on cases (not cited by First American) that involve misrepresentation or other tort claims that are neither asserted nor applicable here. *See*, *e.g.*, *Barstad v. Stewart Title Guar. Co., Inc.*, 39 P.3d 984, 985–87 (Wash. 2002) (noting that lenders who brought claims for negligent misrepresentation, violations of the Consumer Protection Act, and civil conspiracy only received a preliminary title commitment but did not purchase title insurance); *Siegel v. Fid. Nat. Title Ins. Co.*, 54 Cal. Rptr. 2d 84, 85–88 (Cal. Ct. App. 1996) (rejecting owners' negligence and contract claims against an insurer that sold a title insurance policy to the lender because the insurer did not have a fiduciary or contractual relationship with the owners, who failed to purchase title insurance); *Hulse v. First Am. Title Co. of Crook Cty.*, 33 P.3d 122, 126, 134, 138 n.8 (Wyo. 2001) (rejecting insured's negligence claim against insurer because issuance of title commitment and title insurance policy did not give rise to an implied tort duty to search for and disclose title defects, and rejecting insured's contract claim when access to property still existed). And in the only Arizona case the dissent cites, the court rejected the owner's claims for negligent misrepresentation based on the title commitment, but remanded for a determination on the owner's breach of contract claim based on the insurance policy. *Centennial Dev. Grp.*, 233 Ariz. at 148 ¶¶ 1–3, 310 P.3d at 24.

**¶43**        The dissent is puzzling for another reason as well. It asserts that our analysis incorrectly "presumes" that First American "had any duty to discover and disclose the title defects." *Infra* ¶ 59. The dissent's "no duty" argument (an argument First American does not make and with which we do not disagree) would make sense if Johnson Bank were alleging a tort or claiming that the insurer breached the policy by not discovering and disclosing the encumbrance. But because Johnson Bank makes no such

claim, the "no duty" argument is illogical and inapplicable. In accordance with the policy's language, the bank merely seeks "indemnity against actual monetary loss or damage" it allegedly sustained "by reason of" the title defect. That contract claim does not hinge on any extra-contractual duty owed or breached, and the "no duty" proposition has no bearing on *how* damages should be calculated under the indemnification policy's ambiguous § 7(a)(iii). First American concedes that it "is responsible *for the diminution in value of the collateral as a result of the title defect*." Thus, the dissent's "no duty" argument is not only off point but also inconsistent with First American's position.

¶44        In any event, we do not find or impose on First American any extra-contractual tort or other common law duties. But in resolving the ambiguity in First American's policy by evaluating relevant social policies and the parties' transaction as a whole, we quite properly consider that First American was in the best position to timely discover and disclose the title defect, and to thereby avoid the risk of loss in a depreciating real estate market, but failed to do so. *See supra* ¶ 24. Because evaluation of relevant social policies and the parties' transaction as a whole does not resolve the policy's ambiguity, and because we must then construe the policy against the insurer, First American should bear that risk. That conclusion is not based on inapplicable tort law or statutes, but rather on the analytical framework this Court has adopted. *Action Acquisitions*, 218 Ariz. at 397 ¶ 8, 187 P.3d at 1110. The dissent is unpersuasive in arguing otherwise.

**D.**

¶45        First American argues that the court of appeals erred by assuming, without any evidentiary support in the record, that the title defect caused the borrowers' default and Johnson Bank's subsequent foreclosure. *First Am. Title*, 237 Ariz. at 493 ¶ 14, 494 ¶ 17, 353 P.3d at 373, 374. We agree.

¶46        There is no evidence demonstrating that the undisclosed title defect caused the borrowers' default. Although Johnson Bank points to the unpublished court of appeals' decision that affirmed judgment in favor of the borrowers/owners in their action against First American, that case does not establish as a matter of fact or law that the title defect caused the borrowers' default. *See Troon H Pad, L.L.C. v. First Am. Title Ins. Co.*, No. 1 CA-CV 11-0491, 2013 WL 440609, at *5 ¶ 24 (Ariz. App. Feb. 5, 2013)

16

(mem. decision) (noting some trial testimony that the owner "had lost an investor because the title defect affected the ability of the parcels to be developed"). Nor can we take judicial notice of that necessary causal link. *Cf.* Ariz. R. Evid. 201. Accordingly, the court of appeals erred by directing entry of summary judgment in favor of Johnson Bank. *First Am. Title*, 237 Ariz. at 494 ¶ 18, 353 P.3d at 374.

¶47 On remand, Johnson Bank will have to prove that the title defect caused the borrowers' default and subsequent foreclosure to justify using the date of the policies as the valuation date. If Johnson Bank fails to satisfy this burden, then the proper valuation date is the foreclosure date.

## III.

¶48 For the foregoing reasons, we vacate the court of appeals' opinion, reverse the judgment in favor of First American, and remand the case to the superior court for further proceedings.

¶49 Johnson Bank requests attorney fees under A.R.S. § 12-341.01, which permits an attorney fee award in contract actions. In our discretion, we deny the request, without prejudice to Johnson Bank seeking in the superior court any fees incurred in this Court, should Johnson Bank eventually prevail on remand.

Bales, C.J., dissenting.

¶50        I agree with the majority that the title insurance policy is facially ambiguous regarding the proper date (policy issuance versus foreclosure) on which to measure an insured lender's loss when an undisclosed title defect, lien or encumbrance (a "title defect") reduces the value of property securing a loan.  *Supra* ¶ 18.  I also agree that the diminution in value generally is measured as of the date of foreclosure. *Supra* ¶ 47.  Because I believe the same date should be used in the circumstances of this case, I respectfully dissent.

¶51        The majority holds that the drop in value should be measured as of the policy's issuance when an undisclosed title defect prevents the known, intended use of the property and causes the borrower to default. *Supra* ¶¶ 1, 28.  Recognizing that this approach shifts to the title insurer "loss[es] attributable to [a] market downturn (which could occur irrespective of any title defect or error in the title search)," *id.* ¶ 28, the majority concludes that this result "offends neither the policy language nor the relevant, identified social policies." *Id.*  The majority's holding rests on its repeated observations that First American "failed" to discover and disclose the restrictive covenants for the subject property or that it conducted a "deficient" or "incomplete" title search when First American offered to extend title coverage before Johnson Bank issued loans to its borrowers.  *Supra* ¶¶ 1, 2, 24, 29.

¶52        Loss under the policy should not be measured by imputing duties to the title insurer that are inconsistent with the policy itself and Arizona's statutory framework.  Although the policy may be facially ambiguous with regard to the date of valuation for calculating loss, the nature of the parties' transaction as well as the policies reflected in Arizona's title insurance statutes resolve that ambiguity: absent a contrary indication by the parties, loss should be measured as of the date of foreclosure. *Cf. First Am. Title Ins. Co. v. Action Acquisitions, LLC*, 218 Ariz. 394, 397 ¶ 8, 187 P.3d 1107, 1110 (2008) (discussing how facial ambiguity of insurance policy may be resolved by "looking to legislative goals, social policy, and the transaction as a whole").

¶53        Title insurance, as the parties acknowledge, is a contract of indemnity, not a guarantee of title. *E.g., Centennial Dev. Grp. LLC v. Lawyer's*

*Title Ins. Corp.*, 233 Ariz. 147, 149 ¶ 6, 310 P.3d 23, 25 (App. 2013); *Associated Bank, N.A. v. Stewart Title Guar. Co.*, 881 F.Supp.2d 1058, 1066 (D. Minn. 2012). A title insurer cannot "fail" to disclose title defects to a lender seeking title insurance unless it owes a duty to the lender to discover and disclose such defects when it offers to provide coverage on a property. *See Centennial Dev. Grp.*, 233 Ariz. at 150 ¶¶ 9–10, 310 P.3d at 26; *First Midwest Bank, N.A. v. Stewart Title Guar. Co.*, 843 N.E.2d 327, 335 (Ill. 2006); *Barstad v. Stewart Title Guar. Co., Inc.*, 39 P.3d 984, 987–88 (Wash. 2002).

¶54 Courts have consistently recognized that a title insurer has no implied duty to search title records for defects when it contracts to provide title insurance. *E.g., Hulse v. First Am. Title Co. of Crook Cnty*, 33 P.3d 122, 134–35 (Wyo. 2001); *Barstad*, 39 P.3d at 990–91; *Greenberg v. Stewart Title Guar. Co.*, 492 N.W.2d 147, 151–52 (1992); *Lawrence v. Chicago Title Ins. Co.*, 192 Cal.App.3d 70, 76–77 (1987). Therefore, any duty to investigate the condition of title can result only from a voluntary assumption of that duty in addition to the mere contract to insure title. *Hulse*, 33 P.3d at 134–36; *Greenberg*, 492 N.W.2d at 152. If a title insurer undertakes no contractual duty to discover or disclose title defects to a lender when it offers to provide title insurance, then a lender could not reasonably expect such an offer to serve as any kind of guide regarding "the value of the lender's security interest," *supra* ¶ 29, or as a hedge against the risk of market downturns. *See First Midwest Bank, N.A.*, 843 N.E.2d at 335.

¶55 Under Arizona law, a duty to discover or disclose title defects is imposed by an abstract of title, not by a title insurance policy. *See* A.R.S. § 20-1562(1) (requiring an abstract of title to disclose "all recorded conveyances, instruments or documents that impart constructive notice with respect to the chain of title to the real property"). When a title insurer offers to provide title insurance for a property, it issues a title commitment. *See* § 20-1562(5) (defining "title commitment" as an offer to issue a title insurance policy subject to any stated exceptions). Once escrow closes and the loan documents have been recorded, a title policy is issued based on the precise terms of the title commitment. *See* § 20-1562(11) (defining "title insurance policy" as the means by which title insurance liability is accepted); *see also* Palomar, 1 Title Ins. Law § 5:29. Unlike an abstract of title, a title commitment is explicitly exempted from any duty to discover or disclose title defects. § 20-1562(5) ("the rights, duties and responsibilities relating to the preparation and issuance of an abstract of title do not apply to the issuance of a [title commitment]. The [title commitment] is not a

representation as to the condition of title to real property"). The parties, of course, are free to contract around these statutory definitions, but we are not so free to ignore our statutory scheme. *See e.g., Tower Plaza Investments Ltd. v. DeWitt*, 109 Ariz. 248, 253, 508 P.2d 324, 329 (1973) (the laws of a state are part of a contract and must be read into it).

¶56 Our sister courts in Washington and California – which share the same statutory definitions of "abstract of title," "title commitment," and "title insurance policy" as Arizona – have reached similar conclusions. The Supreme Court of Washington, after discussing the same statutory differences between an abstract of title, title commitment, and title policy that are present here, expressly held that a title insurer owes no duty to a lender to discover or disclose any information regarding the condition of title when it offers to provide title insurance. *Barstad*, 39 P.3d at 988–89, 991. *Barstad* emphasized that the party seeking title insurance has no reasonable expectation to any information concerning the condition of title for the subject property, and that any research conducted by the insurer was exclusively for its own benefit, not for the benefit of the insured. *Id.* at 990–91.

¶57 Similarly, California's Court of Appeal has recognized that the statutory definitions of "abstract of title," "title commitment," and "title insurance policy" – which are virtually identical to Arizona's – preclude courts from imposing a duty on a title insurer to discover and disclose title defects when it contracts for title insurance. *E.g., Siegel v. Fid. Nat'l Title Ins. Co.*, 46 Cal. App. 4th 1181, 1189, 1193 (1996). The statute makes clear that a title policy is "*not* a summary of the public records, and the insurer is *not* supplying information" regarding the condition of title to the insured. *Lawrence*, 192 Cal.App.3d at 75. Like Washington, any title search that an insurer chooses to conduct is strictly for the insurer's own benefit and has no bearing on the insured. *Fid. Nat'l Title*, 215 Cal.App.3d at 1175.

¶58 Under Arizona's statutory framework and the policy at issue here, First American did not undertake a duty to discover any title defects or disclose them to Johnson Bank before the lender made the loan. *Accord Hulse*, 33 P.3d at 134–36; *Barstad*, 39 P.3d at 988–91. Instead, the insurer agreed that if an undisclosed title defect was later discovered and caused "actual monetary loss" to the lender, First American would pay the lesser of: the unpaid loan balance, the cost of curing the title defect, or the diminution in value resulting from the defect. The appropriate date for

calculating loss in this context is when it in fact occurred – the date of foreclosure.

**¶59**        The majority's conclusion that loss may be measured as of policy issuance is both self-contradictory and inconsistent with the nature of title insurance under Arizona law.  The majority acknowledges that a lender's title insurance policy is not a guarantee of title, *supra* ¶ 21, and denies imposing any "extra-contractual duties" on the insurer.  *Supra* ¶ 47. Nonetheless, the majority asserts that measuring loss as of the date of issuance is appropriate because the insurer conducted a "deficient title search" and its failure to disclose the defect caused "actual consequential damages" to the lender.  *Supra* ¶¶ 24, 26.  This can only mean that the lender was damaged because the insurer breached some duty (contractual or otherwise) to properly investigate title and disclose it to the lender before the loan was funded.  (The treatise cited by the majority in support of measuring loss by the policy date, s*upra* ¶ 28, does not address Arizona's statutory framework and fails to adequately distinguish between a lender's policy and an owner's policy, as the latter might warrant using date of issuance to measure loss, since the owner's equity is immediately impaired by the undisclosed defect.)  The majority argues that cases or statutes like A.R.S. § 20-1562(5) recognizing that a title policy is not a representation about the condition of title are inapposite because Johnson Bank is not asserting claims based on tort or the title commitment.  *Supra* ¶¶ 47, 48.  The relevant point is not the nature of the claims asserted by the lender, but instead whether the title insurer had any duty to discover and disclose the title defects, as the majority's analysis presumes.

**¶60**        Based on a mistaken characterization of a title insurer's responsibilities to a lender, the majority ultimately concludes that it will construe the "ambiguous" policy in favor of the insured, and thereby allow the lender to measure loss as of the date of policy issuance if the defect "caused the borrowers/owners to default on Johnson Bank's loans." *Supra* ¶ 37.  To do otherwise, the majority states, would allow the insurer to "unfairly" avoid paying the lender's damages. *Supra* ¶ 26.

**¶61**        I respectfully disagree.  Because First American did not undertake by issuing title insurance to then discover any title defects or disclose them to the lender, it is not appropriate to adopt a measure of loss (date of policy issuance) that presumes such duties.  If the lender wanted some representation regarding the condition of title it could have

purchased an abstract of title; similarly, if it wanted to shift the risk of market loss (an underwriting risk generally born by lenders rather than title insurers), it might have contracted to do so. We should not, however, interpret the title policy as implicitly adopting a measure of loss that does not comport with the expressed intent of the parties, the nature of title insurance, or Arizona's policy as expressed in our title insurance statutes.